ELVERSON CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 93281.   Promulgated October 6, 1939.

*Ellsworth C. Alvord, Esq., Alger B. Chapman, Esq., Karl Riemer, Esq.,* and *Floyd F. Toomey, Esq.,* for the petitioner.
*Thomas H. Lewis, Jr., Esq.,* for the respondent.

618

OPINION.

MELLOTT: The principal question is, What was the amount of taxable income realized by petitioner during the year 1934 from the acquisition of 136,000 shares of the common stock of the Inquirer Co. of Delaware, hereinafter sometimes referred to as the pledged collateral? Petitioner contends that it is limited, as a matter of law, to the amount by which the face amount of the canceled notes ($3,488,750) exceeded the cost of such notes ($3,453,750) or $35,000; that the pledged collateral was acquired by it in payment of the outstanding purchase money notes; and that in accepting this collateral in payment of said notes it merely became a purchaser thereof for their face amount. Respondent insists that the agreement of April 3, 1934, as carried out, resulted in taxable gain to petitioner, measured by the difference between the fair market value of the pledged collateral on the date it was acquired by the petitioner and the cost to it of the notes. Both parties concede that the agreement of April 3, 1934, resulted in the ultimate acquisition by petitioner of the stock in October of the same year. A brief resumé of the facts may lead to a better understanding of the contentions of the respective parties.

Prior to March 4, 1930, Raymond Patenotre owned 151,000 of the 191,000 outstanding shares of the common stock of the Inquirer Co. of Delaware, and all of the outstanding stock of the Inquirer Co. of Pennsylvania. On that date he sold his entire holdings in these two companies to the Curtis-Martin Newspapers, Inc. (which later became and will hereinafter be referred to as Public Ledger, Inc.), for a total consideration of $10,500,000, one-half of which was paid in cash and the remainder in notes of the purchasing company bearing 6 percent interest and payable in equal quarterly installments over a period of years.

On the same date, March 3, 1930, an indenture of trust was made between Public Ledger, Inc., and the Bankers Trust Co. of New York under which the 151,000 shares of common stock of the Inquirer

Co. of Delaware were deposited with the Bankers Trust Co., as trustee, to secure the payment of principal and interest on the notes. The indenture provided for the release of part of the pledged collateral after specified amounts had been paid, and directed the trustee, upon default in the payment of principal or interest on any of the notes which continued for a period of 30 days after the due date, to sell the collateral when requested to do so by the holders of the defaulted notes, to apply the proceeds thereof to the payment of the notes and costs, and to pay over the surplus, if any, to Public Ledger, Inc. It also provided that the principal of all notes and accrued interest thereon should become due and payable in the event of default and sale of the collateral, and stated that the exercise of any of the remedies provided therein in the event of default should in no way impair the right of the holder or holders of the notes to recover from the maker or endorser any deficiency on account of principal or interest over and above the amount realized from the sale of the securities deposited with the trustee.

Prior to April 3, 1934, petitioner had acquired, by purchase, all of the outstanding purchase money notes. On that date these notes totaled $3,488,750, and 136,000 shares of the common stock of the Inquirer Co. of Delaware remained on deposit with the trustee as collateral security. The notes falling due on March 4, 1934, were not paid. Public Ledger, Inc., requested an extension of time for the payment of all the notes falling due in 1934. This request was granted upon terms and conditions contained in an agreement dated April 3, 1934, signed by the four interested parties—the petitioner, Public Ledger, Inc., the trustee under the indenture, and the endorser of the notes.

The principal commitments of Public Ledger, Inc., under the agreement were to transfer to the Inquirer Co. of Delaware the morning and Sunday editions of the Public Ledger; to execute and deliver to the trustee for the account of petitioner $1,400,000 principal amount of income bonds; and, upon default in the payment of principal or interest on the notes, to surrender to petitioner all of its right, title, and interest in the pledged collateral, including any equity of redemption. The principal commitments of petitioner were to extend the time of payment of all notes falling due in 1934; to release and discharge Public Ledger, Inc., and the endorser of the notes from all liability thereon; and to cancel the income bonds, if, upon default in the payment of principal or interest, the pledged collateral should be surrendered for its benefit. Petitioner also agreed, in the event of the surrender of such collateral, to purchase from Public Ledger, Inc., at $53.75 per share, but in an amount not in excess of $600,000, such number of shares of the common stock of the Inquirer Co. of Delaware then owned by Public Ledger, Inc.,

as would enable the latter corporation to discharge its indebtedness to the Inquirer Co. of Delaware. It was also given the option to purchase from Public Ledger, Inc., within 90 days from the surrender of the collateral, any other shares of the common stock of the Inquirer Co. of Delaware owned by Public Ledger, Inc., at a "fair value", to be determined by mutual agreement or arbitration.

Public Ledger, Inc., failed to pay the interest due on September 4, 1934, and on October 16, 1934, all of its right, title, and interest in the pledged collateral was surrendered to the petitioner. On the same date the petitioner delivered the notes and the income bonds to the trustee, with instructions that they be canceled and destroyed, and its nominee purchased 10,550 shares of the common stock of the Inquirer Co. of Delaware from Public Ledger, Inc., at $53.75 per share.

The parties agree that the transaction is controlled by the agreement of April 3, 1934, but differ in their interpretation of its provisions. According to petitioner's interpretation, it acquired the pledged collateral in payment of the outstanding purchase money notes, thereby becoming a purchaser of such stock for the face amount of the notes. It urges that by the agreement of April 3, 1934, the parties, dealing at arm's length, fixed the value of the pledged collateral at an amount not exceeding the face amount of the outstanding notes, and that Public Ledger, Inc., was, in effect, given an option to sell this collateral to the petitioner at any time for the amount of the notes. Petitioner thus arrives at the conclusion that it realized no gain in excess of the difference between the face amount of the notes and their cost to it.

Respondent asserts that the position taken by petitioner is based upon a misconception of the purport of the agreement of April 3, 1934. He urges that the intention of the parties must be determined from a consideration of the contract as a whole (*Black* v. *United States*, 91 U. S. 27) rather than from a consideration of the forfeiture clause only, and that what actually happened was that the parties entered into an enforceable contract for an extension of the time of payment of certain notes, the consideration for such extension being an absolute obligation on the part of the debtor either to make payments not previously required of it (to pay the $1,400,000 income bonds), or, to give up property having a value greatly in excess of the face amount of the notes. Inasmuch as petitioner received the property (i. e., the pledged collateral, enhanced in value by the morning and Sunday editions of the Ledger), respondent contends that it realized taxable income measured by the difference between the fair market value of such property and the cost of the notes.

In support of its contention that in accepting the pledged collateral it became a purchaser thereof for the face amount of the notes, petitioner cites and relies on *Betty Rogers*, 37 B. T. A. 897; affd., 103 Fed. (2d) 790; *Suisman* v. *Eaton*, 15 Fed. Supp. 113; affd., 83 Fed. (2d) 1019 (C. C. A., 2d Cir.); certiorari denied, 299 U. S. 573; *Carlisle Packing Co.*, 29 B. T. A. 514; and *E. F. Simms*, 28 B. T. A. 988. The cited cases hold that the transfer of property by a debtor to a creditor in satisfaction of a debt is to be treated as a sale of the property for the face amount of the obligation. Petitioner's contention is that if the debtors in the cited cases made sales, the creditors made purchases of the property for the face amount of the debts. It therefore argues that, by a parity of reasoning, it was a purchaser of the stock of the Inquirer Co. of Delaware.

Ordinarily the purchase of property does not result in a deductible loss or a taxable gain, even though the price paid is more, or less, than the value of the property acquired. *Palmer* v. *Commissioner*, 302 U. S. 63; *Hadley Falls Trust Co.* v. *United States*, 22 Fed. Supp. 346; *Taplin* v. *Commissioner*, 41 Fed. (2d) 454; *Commissioner* v. *Van Vorst*, 59 Fed. (2d) 677; *Grigsby* v. *Commissioner*, 87 Fed. (2d) 96; *Delbert B. Geeseman*, 38 B. T. A. 258. If petitioner's interpretation of the transaction is correct, the taxable income realized by it is limited to the amount by which the face amount of the notes exceeded their cost.

Petitioner concedes that if Public Ledger, Inc., had paid the notes and the income bonds and had retained the pledged collateral, it would have realized taxable gain. It urges, however, that when, upon default, it received the pledged collateral, the transaction was precisely the same as if the collateral had been surrendered to it on April 3, 1934, before the execution of the agreement. Such a construction ignores some of the important changes in the rights of the parties under the agreement. Under the note indenture, the trustee upon default was to sell the pledged collateral, apply the proceeds to the payment of the outstanding notes, and surrender any excess to the maker of the notes. If such a sale resulted in a deficiency, the creditor (petitioner) was given the right to collect it either from the maker or endorser. Under the agreement of April 3, 1934, there was to be no sale of the pledged collateral upon default; so there was no possibility that the debtor would ever receive any sum, regardless of how valuable the collateral should become. In addition, the debtor was required to enhance the value of the pledged collateral very substantially by transferring to the Inquirer Co. an asset which witnesses for both parties valued at more than a million dollars, viz., the morning and Sunday editions of the Public Ledger, and to surrender its equity of redemption.

The fundamental rule in the construction of contracts is to ascertain the intention of the parties. *Canal Co.* v. *Hill*, 82 U. S. 94, 100. This intention is to be collected from the entire instrument, viewed in the light of the subject with which it deals, and not from single words, phrases, or sentences. *Green County, Kentucky* v. *Quinlan*, 211 U. S. 582, 594. As we view the agreement of April 3, 1934, petitioner granted its debtor an extension in the time of payment of the notes due in that year under such terms and conditions that it would be assured of receiving, upon the completion of the contract, either (1) $3,488,750, plus interest, and $1,400,000 principal amount of income bonds; or (2) 136,000 shares of the common stock of the Inquirer Co. of Delaware, enhanced in value by the morning and Sunday editions of the Public Ledger. It is not necessary to characterize the agreement as a contract of purchase, sale, or exchange. It was, as the parties intended it to be, a substitute for their earlier agreement. The condition which was to give rise to the receipt of the first consideration was the payment of the notes and interest as they became due. In the event of default in the payment of principal or interest, petitioner became entitled to receive the second, or alternative consideration. The alternative consideration was received and, in our opinion, resulted in taxable income to petitioner.

The conclusion which has been reached accords with the underlying principle of such cases as *Salvage* v. *Commissioner*, 76 Fed. (2d) 112; affd., 297 U. S. 106; *Beals' Estate* v. *Commissioner*, 82 Fed. (2d) 268, 270; and *Cox* v. *Helvering*, 71 Fed. (2d) 987. In *Salvage* v. *Commissioner*, an officer and employee of a corporation was permitted to purchase 1,500 shares of its stock for $100 per share, which had a value at the time of the purchase of $1,064.70 per share. The shares were sold to the officer at less than their real value in consideration of his agreement not to engage in any competing business and to permit the corporation to repurchase part of it at $100 per share. The court held that the officer made a "bargain purchase" of the shares and that the portion thereof which represented the consideration for his covenant not to compete, was taxable income in the year the shares were received. In *Cox* v. *Helvering*, it was held that an amount paid by a purchaser of the business of a corporation in consideration of an agreement of its stockholders to refrain from engaging in a competing business for a limited period was taxable income, and a similar conclusion was reached in *Beals' Estate* v. *Commissioner*. Cf. *Albert Russel Erskine*, 26 B. T. A. 147; *W. M. Ritter Lumber Co.*, 30 B. T. A. 231, 274.

In the cited cases the courts included in the taxpayers' gross income the consideration received for the covenant to do, or to refrain from doing, some act. They pointed out that such consideration

came squarely within the exceedingly broad statutory definition of gross income, being gains, profits, or income derived from dealings in property or growing out of its ownership. The same definition of gross income is contained in the Revenue Act of 1934. (Sec. 22 (a).) If, therefore, it can be said that petitioner received a consideration for granting an extension of time and forbearing from demanding payment of the notes due, the consideration so received should be included in its gross income. This is the essence of respondent's contention and the theory under which the deficiency was determined.

Petitioner contends that the granting of the extension of time was relatively unimportant; that the important consideration for the contract of April 3, 1934, from the standpoint of the debtor, was that it and the endorser of the notes were released from liability under their respective contracts; that its right to receive the pledged collateral was the consideration for releasing the maker and endorser; and that it agreed to accept the pledged collateral in full payment of the notes only because of the transfer of the morning and Sunday editions to the corporation whose stock was pledged.

While petitioner's argument is not without substance, we are of the opinion that the basic consideration for the commitments made by the debtor in the agreement of April 3, 1934, was, as stated therein, "an extension of time for the payment of the principal of certain notes, * * * agreed to by Elverson Corporation upon the terms and considerations stated in this agreement." The essence of the terms and considerations, as we have pointed out above, was that the debtor would do one of two things—pay an additional $1,400,000 or surrender the collateral, enhanced in value by the morning and Sunday editions of the Ledger. The latter was done and we think it resulted in taxable income to petitioner to the extent that the value of the property surrendered exceeded the cost of the notes. We therefore affirm the respondent in his determination of a deficiency. He erred, however, in ascribing too large a value to the stock.

There is no definite formula by which fair market value can be determined. *Crawford* v. *Helvering*, 70 Fed. (2d) 744. It is a question of fact to be determined from all of the evidence. *Heiner* v. *Crosby*, 24 Fed. (2d) 191. The generally accepted definition of "fair market value" is the price at which a seller, willing to sell at a fair price, and a buyer, willing to buy at a fair price, both having reasonable knowledge of the facts, will trade. As a general rule, the best evidence of fair market value of stock is the price at which it is bought and sold on the open market; *Rice* v. *Eisner*, 16 Fed. (2d) 358; certiorari denied, 273 U. S. 764; *Grant Co.* v. *Duggan*, 94 Fed. (2d) 859; *Hazeltine Corporation* v. *Commissioner*, 89 Fed. (2d)

513; *T. W. Henritze*, 28 B. T. A. 1173; *Susan T. Freshman*, 33 B. T. A. 394; *William S. Gordon, Trustee*, 33 B. T. A. 460; but market value may exist independent of sales. *Benedict Crowell* v. *Commissioner*, 62 Fed. (2d) 51; *Old Colony Trust Co.* v. *Commissioner*, 59 Fed. (2d) 168; *French Dry Cleaning Co.* v. *Commissioner*, 72 Fed. (2d) 167. "The value of shares in a commercial or manufacturing company depends chiefly on what they will earn, on which balance sheets throw little light." *Borg* v. *International Silver Co.*, 11 Fed. (2d) 147. However, in estimating the value of common stock of a corporation where there are no sales, the value of the net assets of the corporation have an important bearing. *Oxford Paper Co.* v. *United States*, 52 Fed. (2d) 1008.

Although petitioner has cited several cases in support of its contention that the stock of the Inquirer Co. had no fair market value on October 16, 1934, only one, *Houghton* v. *Commissioner*, 71 Fed. (2d) 656; certiorari denied, 293 U. S. 608, deals with the valuation of stock of a corporation established in business for years and showing a record of consistent earnings. In that case the Circuit Court of Appeals for the Second Circuit affirmed the decision of this Board, holding that the common and preferred stock of a corporation held by members of one family had a fair market value. The court pointed out that a "fair market value" does not always exist, citing *Helvering* v. *Walbridge*, 70 Fed. (2d) 683, wherein it was held that an interest in a newly created partnership did not have any market value. It emphasized, as the factor which distinguished the case from other cases (some of which are relied upon by petitioner), the fact that it was not then considering an untried venture, but an old, profitable, thoroughly seasoned business, which had paid large dividends and was as stable as such ventures could be, and that the interests of the owners were shares of stock, the commonest form of industrial property.

The Inquirer Co. of Delaware (or its predecessor, the Inquirer Co. of Pennsylvania) had been engaged in the business of publishing a morning and Sunday newspaper in the city of Philadelphia for more than 50 years. The newspaper had been published continuously for more than a century. Its franchise, that is, its publishing opportunity, was, and is, one of the best in the United States. For 30 years immediately preceding 1935 it operated at a profit. During the last 10 years of that period its average annual net income was $731,557, its largest being $1,451,262 in 1929, and its smallest being $289,559 in 1933. In 1935 its net income was $962,314, and for the first five months of 1936 it was $549,820. The average net paid circulation of its morning edition increased from 161,898 in 1906 to 208,338 in 1933, 258,560 in 1934, and 277,099 in 1935. Its Sunday edition increased from 179,221 in 1906 to 384,923 in 1933, 547,373 in

1934, and 670,251 in 1935. Its advertising lineage, which was 8,808,900 agate lines in 1906, increased to more than 12,000,000 in 1916; and since that time has never dropped below that amount with the exception of 1933, when it was 10,505,658.

In our opinion these facts, together with the financial condition of the company and the testimony of witnesses for both parties, indicate that the stock had some fair market value.

Six witnesses expressed opinions as to the fair market value of the stock on October 16, 1934. The four called by the petitioner placed the value at $20, $24.30, $21.50, and $18.59, and the two called by the respondent placed it at $40 and $37.50.

While petitioner's witnesses differed in their methods of arriving at the values fixed by them, their respective computations indicate that they all considered the value of the common stock to be the equivalent of the net worth of the business, after deducting the preferred stock liability. Its first witness, a publisher and publisher's counsel, took the amount of the nonpublishing assets as shown on the balance sheet of September 30, 1934, added thereto an amount which he determined to be the value of the working capital plus good will, and $1,000,000 to represent additional value resulting from the merger with the Ledger, deducted from the total the liabilities of the Delaware Co., and thus determined the value of the total outstanding common stock (174,069 shares) of the company to be $3,550,191.05, or $20 per share.

The second witness, a consulting economist, who had had considerable experience in connection with the valuation of stock for tax purposes, found from the September 30, 1934, consolidated balance sheet that the tangible assets of the company aggregated $9,007,855 and that the consolidated liabilities plus the retirement price of the preferred stock aggregated $10,020,958. He concluded that any value attaching to the common stock would have to depend entirely upon the value of the good will. His first step in the valuation of good will was the ascertainment of prospective earnings. He found the average annual earnings of the enterprise for the five-year period 1930 to 1934, inclusive, before deducting interest paid, to be $1,137,114, and that these earnings were reasonably in prospect for the future. He then divided the earnings, separating those due to the tangible property from those due to good will. He decided that, in view of the continuity of earnings since 1920 and the reasonably safe and certain character of the property, the earnings due to the use of the gross tangibles would be 8 percent of the book value of the consolidated tangible property, or $720,628 (8 percent of $9,007,855). He then subtracted the latter amount from his total estimated annual earnings of $1,137,114, which left $416,487 that he designated as excess earnings attributable to the intangibles of the consolidated companies.

This excess he capitalized at 10 percent, or $4,164,870, and thus found the valuation of the good will or intangibles. He then added the good will value so determined to the gross consolidated tangible assets of $9,007,855, subtracted the consolidated liabilities, including the preferred stock at its retirement price, or $10,020,958, and thus arrived at the amount of $3,151,767, which he determined to be the value of the common stock of the Delaware Co. before acquisition of the Ledger circulation, or $18.11 per share. In determining the value of the increment resulting from the merger with the morning and Sunday Public Ledger, he resorted to some extent to subsequent events and found that for the 29-month period from January 1934 through May 1936, which included 25½ months after the merger, the company's earnings before deducting interest were at the rate of $1,246,783 per year, or $109,669 in excess of the average for the 1930–1934 period. He concluded that this amount represented a reasonable prognostication of additional future earnings due to the merger, capitalized it at 10 percent, and obtained an additional value of $1,076,690 (apparently erred in his computation as amount should be $1,096,690), or $6.19 per share. Adding this $6.19 to the $18.11 value previously found, gave him the figure of $24.30 which he considered to be "the maximum value that can be ascribed to the stock."

The third witness for petitioner, a newspaper engineer who specialized in the rehabilitation or reorganization of newspaper operations, arrived at a valuation of $21.50 per share in somewhat the same manner as the preceding witness, except that he determined the value for good will by taking the five-year average of daily circulation at $10 per subscriber and adding thereto the five-year average of Sunday circulation at $5 per subscriber. He, however, made very little, if any, allowance for the increase in value resulting from the addition of the Ledger's morning and Sunday circulation.

The fourth witness for the petitioner, the assistant general manager, secretary, and treasurer of a corporation which publishes 2 newspapers and controls a chain of 16 others through stock ownership, was of the opinion that the value should be fixed "some place between" $11.90 and $18.59 per share. He concluded that if he were a willing buyer he would offer $11.90 per share, and that if he were a willing seller he would demand $18.59 per share. In arriving at these figures, he added together the earnings of the Delaware Co., before deducting interest (except mortgage interest) and taxes, for the 10-year period 1925–1934. To this he added the earnings of the Pennsylvania Co., after eliminating intercompany items, which gave him a total of $10,021,368.10. He then estimated that earnings would increase $175,000 per year because of the merger. In order to reflect this in his 10-year earnings figure, he multiplied it by nine, and added $50,000 more to represent the first 3½ months of 1934, prior

to the merger. He thus arrived at the figure of $1,625,000 to be added to the 10-year earnings, which resulted in a grand total of $11,646,368.10, or an average of $1,164,636.81 per year. Seven times this, less the notes and preferred stock, represented what in his opinion would be the buyer's offer, and eight times this, less the notes and preferred stock, the seller's "asking price."

In the opinion of respondent's first witness, a newspaper consultant, the major factor affecting the value of the Delaware Co.'s stock was the earnings which the enterprise would produce for the owner of the stock. He compiled the operating earnings of the business for the nine and three-fourths years from January 1, 1925, to September 30, 1934, i. e., from the net income of the Delaware and Pennsylvania companies for this period he subtracted the investment income received as dividends and interest, and added back the interest, amortization and premium charges on the variable funded debt, an item of stock transfer taxes, and the Federal taxes paid. He thus obtained a consolidated operating income for the period of $11,027,800. In judging the earning power of the Delaware Co., he believed that the nine months of 1934 should be eliminated as an unusual period of transition and as including five and one-half months of merged operation. Eliminating this period gave him $10,472,837 for nine years, or an annual average of $1,163,626. To this he added what he determined to be a reasonable amount to expect as future earnings as a result of the merger. This amount is unstated but apparently was approximately $400,000. From the aggregate thus determined he deducted interest of $450,000 on the consolidated funded debt and Federal income taxes at the 1934 corporation rate, which gave him a net figure of slightly in excess of $1,000,000. He cut this figure down to $950,000 to take care of possible future contingencies and deducted the preferred stock dividend requirements of $76,854, thus arriving at the figure of $873,146 representing the annual earnings available for dividends on common stock, or $5 per share on the 174,069 shares outstanding. Applying the capitalization rate of eight times earnings, he concluded that the value of the stock was $40 per share.

Respondent's other witness, who had been connected with an appraisal company engaged in the business of making valuations of industrial, public utility, and commercial properties for 25 years, determined that the average earnings over the nine-year period 1925 to 1933, inclusive, was $1,099,772 before interest charges. He then deducted mortgage interest of $162,000 and note interest on $4,800,000 at 6 percent or $288,000, or a total of $450,000, which left a balance available for preferred and common stock of $649,772. From this amount he deducted the annual preferred dividends on 12,809 shares

of preferred stock of $76,854. He divided the remainder, $572,918, by the 174,069 shares outstanding, which gave him a per share average earning for the common stock of $3.29, without giving effect to the merger with the Ledger. He added $1.41 as the Ledger's earnings which would accrue to the combined companies and arrived at a total per share earning of $4.70. In his opinion a fair rate of capitalization was eight times earnings and he thus arrived at his opinion that the value of the stock was $37.50 per share.

Respondent urges that the lower values arrived at by petitioner's witnesses result from the use of methods which are basically wrong, and that they failed to differentiate between the problem presented when good will is to be valued and that presented in a case involving the valuation of common stock. He insists that a determination of the net worth of the company in excess of its preferred stock does not necessarily demonstrate the value of the common stock, and states that this Board has not accepted the asset value of a long established business corporation, having a consistent record of earnings, as the sole criterion for the valuation of its common stock. In this connection he cites *Anson Evans et al., Trustees*, 29 B. T. A. 710, 716; *May Rogers*, 31 B. T. A. 994, 1006; *James Couzens*, 11 B. T. A. 1040, 1162; *Fred L. Dickey et al., Executors*, 32 B. T. A. 1283; *Williams* v. *Commissioner*, 44 Fed. (2d) 467, 470; *Foss* v. *Commissioner*, 75 Fed. (2d) 326, 330; *William Rhinelander Stewart, Jr., et al., Executors*, 31 B. T. A. 201, 203. He also urges that a value derived from capitalizing earnings, by the methods used by the petitioner's witnesses, does not reflect the true value of the common stock because a large part of the earnings resulted from the use of borrowed money and of money advanced by the holders of preferred stock having a fixed dividend rate. He points out that such money cost the corporation 6 percent or less, whereas, under the assumptions made by petitioner's witnesses, it earned 8 percent or more, whether invested in tangibles or intangibles. This, he says, demonstrates the unsoundness of their valuations inasmuch as it ignores the fact that the fund thereby produced belonged to the common stockholders.

Other points stressed by the respondent are that the petitioner's witnesses failed to differentiate between the value of a block of stock representing control, and the value of a lesser interest, and also failed to include a reasonable amount for increase in earnings due to the merger.

Petitioner agrees with the respondent that the value of the stock of a corporation is seldom to be measured solely by its asset value, but contends that its witnesses did not limit themselves to a determination of asset value as the sole, or even as an important, guide to the value of the stock. It agrees with the respondent that common

stock may be valued by capitalizing, at an appropriate rate, the earnings available for such stock, but does not concede that every other method is improper. It urges that the rate employed by respondent's witnesses is too low to suit their method because it does not reflect the necessity for support of the investment in tangible assets, does not properly reflect the risks of the business, and disregards the amount and nature of the prior obligations. According to petitioner, the obligations ahead of the common stock, i. e., the $4,800,000 of 6 percent notes, and $1,280,900 of preferred stock, constituted one of the most important single factors affecting the question of value. It takes exception to the respondent's statement that its witnesses failed to differentiate between the per share value of a block of stock representing control, and the per share value of a lesser block, and points out that they were asked to express their opinion as to the value of 136,000 shares of stock, "a controlling interest." Petitioner also takes exception to respondent's assertion that its witnesses did not include a reasonable amount of increase due to the merger.

Some of the criticisms are probably justified. Each of the witnesses, however, had sufficient qualifications to express an opinion, and it would serve no useful purpose to attempt to point out possible weaknesses in their testimony. We have found as a fact that the fair market value of the stock of the Inquirer Co. of Delaware was $37.50 per share as of October 16, 1934. While this happens to be the same value expressed by one of the respondent's witnesses, our finding is not based solely on his opinion. Neither have we followed any set rule or formula in arriving at our determination. *Great Northern Railway Co.* v. *Weeks*, 297 U. S. 135, 139; *Rowley* v. *Chicago & North Western Railway Co.*, 293 U. S. 102, 109. We have given special consideration to the earnings of the Inquirer Co. of Delaware and its assets and liabilities, and to the fact that the 136,000 shares of its stock represented a controlling interest; that during the year 1930 it acquired all of the outstanding capital stock of the Inquirer Co. of Pennsylvania for $2,200,000 and in April 1934 acquired the morning and Sunday editions of the Public Ledger, without cost; that during the period between 1930 and 1934, when Public Ledger, Inc., owned the controlling interest in the Delaware Co., it attempted to recover a part of the purchase price of this company's stock by having it declare and pay large dividends and redeem some of its stock at an excessive price; and that, in spite of this selfish and unwise financial management, the Delaware Co. reduced its outstanding preferred stock from $6,267,500 to $1,280,000; reduced the mortgage from $3,200,000 to $3,000,000; reduced outstanding notes from $6,000,000 to $4,800,000; purchased machinery

and equipment at a cost of $471,627; retired 16,931 shares of its common stock; and paid cash dividends of over $2,000,000—all of which was accomplished at a reduction in the company's surplus of only approximately $2,000,000.

Before concluding our discussion of the fair market value of the Delaware Co.'s stock, brief reference will be made to petitioner's alternative contention that it could not have been sold on October 16, 1934, for $37.50 per share, and that, if this amount is the minimum fair price for the pledged collateral on that date, it had no "fair market value." In support of this contention petitioner refers to the fact that the $4,800,000 10-year 6 percent coupon notes which were outstanding on that date had been issued pursuant to an indenture of trust which provided that, in the event the Curtis-Martin interests relinquished control of the company, the holders of the notes would have the option of requesting full payment within 5 months. Petitioner argues that any prospective purchaser of the 136,000 shares of the common stock of the Inquirer Co. of Delaware, which represented control of the company, must have been prepared to face the necessity of raising an additional $4,800,000 to refinance the notes in order to retain the control purchased, and that no purchaser could have been found for the pledged collateral at a price of $5,100,000 (136,000×$37.50) under such circumstances.

We do not believe that the existence of the note liability and the possibility that it would have to be refinanced would have prevented the sale of the stock for $37.50 a share. Obviously any prospective purchaser would take into consideration the possibility that the notes might have to be refinanced. However, that would not have been an insurmountable obstacle to a sale. In 1930 a purchaser was found who paid $8,300,000 for 151,000 shares of the common stock of the Inquirer Co. of Delaware and $2,200,000 for all of the capital stock of the Inquirer Co. of Pennsylvania. It is true, as petitioner points out, that at that time the Delaware Co. did not have an outstanding note liability of $4,800,000. It should not be overlooked, however, that these notes were originally issued in the amount of $6,000,000 for the purpose of raising funds to retire 56,694 shares of preferred stock at $57.50 a share, or $3,374,905, all of which were outstanding at the time of the purchase in March 1930, and to purchase for $2,200,000 all of the capital stock of the Pennsylvania Co. which the Delaware Co. did not own in March 1930. We doubt that a purchaser on that date would have hesitated to pay approximately $8,300,000 for 151,000 shares of the common stock of the Inquirer Co. of Delaware if the corporation at that time had increased its assets by $2,200,000 and decreased its preferred stock liability by $3,374,905, even though in doing so it incurred a note

liability of $6,000,000. While we believe that this is sufficient answer to petitioner's argument, it may not be amiss to mention that in 1936 a corporation purchased all of the outstanding stock of petitioner for $2,515,835.46 when it had liabilities of $7,158,864.44 and when its only assets consisted of 136,000 shares of the common stock and $3,400,000 principal amount of notes of the Inquirer Co. of Delaware. In other words, the effect of this transaction was that the purchaser paid nearly 10,000,000 for 136,000 shares of the Delaware Co. stock and $3,400,000 principal amount of notes, which was equivalent to a payment of $46 per share for the stock which we have valued at $37.50.

In attempting to prove that no purchaser could have been found who would pay $37.50 per share for the stock, petitioner introduced evidence showing that certain unsuccessful efforts were made by Public Ledger, Inc., between September 4 and September 18, 1934, to sell its Inquirer Co. stock or to refinance its indebtedness to petitioner. The record does not disclose the price Public Ledger, Inc., asked for the stock nor the price a prospective purchaser would have been willing to pay. It is reasonable to assume that Public Ledger, Inc., was seeking a purchaser willing to pay an amount sufficient to retire its note liability of $3,488,750, plus accrued interest, to pay the $628,230.50 indebtedness due the Inquirer Co. of Delaware, and to undertake the payment of the $1,400,000 income bonds. None of these liabilities could have been escaped. Their total exceeded $5,100,000. Nor is it surprising that the bankers, who evidently were familiar with the debtor's record, should refuse to refinance it, knowing that it was burdened with the onerous extension agreement of April 3, 1934, and that it was then in default for the interest due on September 4, 1934.

The remaining questions are whether petitioner is subject to tax as a personal holding company under the provisions of section 351 of the Revenue Act of 1934, and, if so, whether it is subject to the 25 per centum addition to tax prescribed by section 291 of the same act for failure to file a personal holding company return.

Section 351 provides that a surtax of 30 per centum shall be levied upon the undistributed, adjusted net income of every personal holding company not in excess of $100,000 and 40 per centum on the amount in excess of $100,000. In so far as here material a "personal holding company" is defined as meaning:

* * * any corporation, * * * if—(A) at least 80 per centum of its gross income for the taxable year is derived from royalties, dividends, interest, annuities, and (except in the case of regular dealers in stock or securities) gains from the sale of stock or securities, and (B) at any time during the last half of the taxable year more than 50 per centum in value of its outstanding stock is owned, directly or indirectly, by or for not more than five individuals.

Assuming for present purposes, though not deciding, that during the last half of the taxable year more than 50 per centum in value of petitioner's outstanding stock was owned, directly or indirectly, by or for not more than five individuals, was 80 per centum of petitioner's gross income derived from the sources specified in subparagraph (A)?

Respondent contends that three kinds of taxable income were derived by petitioner: (1) $35,000 gain from the receipt of more than the cost of the notes (this amount is the difference between the face of the notes, $3,488,750 and their cost $3,453,750); (2) $67,864.79, the gain derived from interest which accrued on the notes from June 4, 1934, to October 16, 1934; and (3) the gain derived from the receipt of the consideration paid for the extension of time. The last two, he says, were clearly personal holding company income, the second being interest *eo nomine*, and the third being interest, though not so designated by the parties.

We have determined that petitioner's dealings with its debtor during the year 1934 resulted in a profit to it of $1,646,250, this amount being the difference between the cost of the notes ($3,453,750) and the fair market value of the stock received ($5,100,000). It is apparent that this amount includes the $35,000 referred to in subdivision (1) of the preceding paragraph. The $67,864.79, referred to in subdivision (2), even though denominated interest by the debtor and the creditor, was properly excluded from petitioner's gross income; for before the end of the taxable year it became perfectly obvious that the amount would never be collectible. *Corn Exchange Bank v. United States*, 37 Fed. (2d) 34; *Turners Falls Power & Electric Co.*, 15 B. T. A. 983; *Francis Ward Paine et al., Executors*, 25 B. T. A. 764; *Estate of George Herder*, 36 B. T. A. 934; *Commissioner v. Brown*, 54 Fed. (2d) 563; certiorari denied, 286 U. S. 556. Indeed petitioner's right to collect it terminated when it took over the stock and surrendered the notes for cancellation.

In its income tax return filed for the year 1934 petitioner reported gross income of $87,677.86 from interest and dividends after deducting a capital loss of $2,000. If the profit of $1,646,250 constituted "personal holding company" income within the purview of section 351, *supra*, petitioner was required to file a personal holding company return on form 1020 H (art. 351–8, Regulations 86), as this profit constituted more than 80 per centum of its gross income for the taxable year 1934. No contention is made that it was derived from royalties, dividends, annuities or the sale of securities and it obviously was derived from none of these sources. Respondent, however, contends that it was derived from *interest*.

In support of his contention, respondent cites several cases holding that the consideration paid for an extension of time constitutes interest within the purview of state statutes against usury. He also cited several cases, such as *Jones Syndicate* v. *Commissioner*, 23 Fed. (2d) 833, and *E. C. Gatlin*, 34 B. T. A. 50, holding that a taxpayer may deduct, as interest, amounts paid under a contract which was devised as a cloak to hide usury and does not correctly describe the relationship of the parties.

The principle of the cited cases does not seem to be applicable to the present facts. Petitioner and its debtor entered into a contract under which petitioner made a substantial profit. We have held that such profit constituted income within the broad statutory definition of that term. But we do not believe that it can, or should be, designated *interest*. Interest, as generally understood, means simply the "compensation allowed by law, or fixed by the parties, for the use or forbearance of money, or as damages for its detention"; "the compensation which is paid by the borrower of money to the lender for its use"; "the price or rate of premium per unit of time, paid by the borrower of money to the lender for its use." 33 Corpus Juris 178; *Joseph W. Bettendorf*, 3 B. T. A. 378, 383; Bouvier's Law Dictionary; Webster's New International Dictionary; *Anderson & Co.*, 6 B. T. A. 713, 716. "The usual import of the term is the amount which one has contracted to pay for the use of borrowed money." *Old Colony Railroad Co.* v. *Commissioner*, 284 U. S. 552, 560. Congress apparently used the word in its usual and commonly accepted sense, *DeGanay* v. *Lederer*, 250 U. S. 376, and there is nothing in the legislative history to indicate that it was to be construed otherwise. *Avery* v. *Commissioner*, 292 U. S. 210. (See Report No. 704, Ways and Means Committee, 73d Cong., 2d sess., p. 11, and Report No. 558, Senate Finance Committee, pp. 13, 16.) "If there were doubt as to the connotation of the term, and another meaning might be adopted, the fact of its use in a tax statute would incline the scale to the construction most favorable to the taxpayer. *Gould* v. *Gould*, 245 U. S. 151; *United States* v. *Merriam*, 263 U. S. 179; *Bowers* v. *Lighterage Co.*, 273 U. S. 346; *United States* v. *Updike*, 281 U. S. 489; *Burnet* v. *Niagara Falls Brewing Co.*, 282 U. S. 648." *Old Colony Railroad Co.* v. *Commissioner, supra*.

It is our conclusion from the foregoing that petitioner did not derive at least 80 per centum of its gross income for the year 1934 from royalties, dividends, interest, annuities, and gain from the sale of stock or securities, and that it was not a personal holding company and as such required to file a personal holding company return. It follows therefore that it was not subject to the surtax prescribed by section 351, *supra*, and is not liable for the 25 per centum addition to

tax imposed by section 291 of the Revenue Act of 1934 for failure to file a return on form 1020 H.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*