Bayonne Furniture Industries, Inc. v. Commissioner.
Bayonne Furniture Industries, Inc. v. Commissioner
Docket No. 56024.
United States Tax Court
T.C. Memo 1957-39; 1957 Tax Ct. Memo LEXIS 217; 16 T.C.M. (CCH) 168; T.C.M. (RIA) 57039; February 28, 1957
Alfred S. Pellard, Esq., 501 Madison Avenue, New York, N. Y., for the petitioner. Charles M. Greenspan, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Respondent determined deficiencies in petitioner's income tax and personal holding company surtax liability as follows: Personal Hold-
ing Company
Year
Income Tax
Surtax
1949
$253.00
$11,356.86
1950
80.50
2,351.53 Petitioner concedes the correctness of the income tax deficiencies as determined. The only remaining issue is whether certain sums received from Philharmonic Radio Corp. during 1949 and 1950 constitute interest, and hence personal holding company income. Findings of Fact Certain facts are stipulated and are hereby *218 found. Petitioner is a corporation organized under the laws of New Jersey on January 14, 1947. It filed Federal income tax returns for calendar years 1949 and 1950 with the collector of internal revenue for the third district of New York. During 1949 and 1950 petitioner had two shareholders, Philip Weisberg and his brother, Frank. It had been organized to manufacture wrought iron furniture, but that business did not prosper. Philip bought the interests of the other three or four shareholders between January and July 1948 for the amounts they originally invested. Philip organized petitioner to provide Frank with a livelihood. Petitioner paid Frank $5,200 in 1949 and $6,000 in 1950 to run the business. Philip received no compensation, salary or dividends from petitioner. As long as petitioner had idle capital, including 1949, it loaned money to Stephen Properties, a real estate company owned by Philip. In 1949 Philip and Frank began to investigate the possibilities of acquiring another business for petitioner. They commenced negotiations with Philharmonic Radio Corp., hereafter referred to as Philharmonic. Philharmonic, a radio manufacturer which had just begun to manufacture *219 television sets, needed additional capital and sales representation. Frank had contacts in the furniture and department store trade which might have been helpful to Philharmonic. Philip had social contacts which might have been beneficial to Philharmonic. On September 1, 1949, petitioner and Philharmonic signed a contract containing the following provisions: "WHEREAS, Bayonne is contemplating procuring from Philharmonic the exclusive right to distribute the products of Philharmonic in the United States east of the Mississippi River, and * * *
"FIRST: Philharmonic hereby grants unto Bayonne the option to act as sole and exclusive distributor of Philharmonic's products in the United States east of the Mississippi River for a term of five (5) years. Said option shall extend up to February 1, 1950 and shall be exercised by Bayonne notifying Philharmonic in writing of its decision to exercise the option. In the event that Bayonne shall exercise said option, Philharmonic and Bayonne shall enter into a written agreement setting forth in detail the terms and conditions of the distributorship." Simultaneously with the signing of and pursuant to the contract, petitioner loaned *220 Philharmonic $100,000 to be repaid in whole or in part at Philharmonic's discretion, but in any event by December 31, 1949, with interest from September 1, 1949 of 3 1/2 per cent per month on the average monthly unpaid balance. After petitioner and Philharmonic signed the contract, Philharmonic became interested in limiting the option for the exclusive distributorship. It conducted negotiations culminating in a direct contract for large sales of television sets to two department store chains. Philharmonic could not obtain those orders unless the distributor's profits were eliminated, and therefore wanted to eliminate, from any exclusive distributorship, orders from those two chains. Frank decided to survey the filed to ascertain whether a sizable business could be built up without the department store chains. The parties orally agreed that $1.50 per television unit manufactured by Philharmonic would be paid to petitioner until February 1, 1950, when a final determination of the distributorship matter was to be made. Philip wanted time to investigate reports that the television sets were not holding up. A letter dated October 22, 1949, signed by petitioner and agreed to by Philharmonic, *221 executed in connection with the modifications, provided as follows: "This will confirm our understanding that the contract between us dated September 1, 1949, covering the loan of $100,000 made to you by us, shall be modified in the following respects: "(a) The date of the repayment of the loan is extended from December 31, 1949 to February 1, 1950. "(b) We hereby waive the requirements that as security for said loan you assign to the Franklin National Bank, as our agent, existing and future accounts receivable and that you deposit the monies collected on such accounts subject to our direction and control. "(c) In consideration of the foregoing you are to pay us, in addition to interest of 3 1/2% per month on the average monthly amount outstanding on the loan, $1.50 (One Dollar and Fifty Cents) per unit on each television set manufactured by you between the date hereof and the date on which said loan shall be completely repaid to us. "(d) The individual guarantee of Bernard H. Lippin shall not be affected by this modification but shall continue to apply in all respects to our agreement as modified by this letter." Petitioner never exercised its option for the exclusive *222 distributorship. Due to a heart attack suffered in November of 1949, Frank was unable to carry on petitioner's business. He died in 1950. Petitioner received from Philharmonic $14,286 in 1949 and $11,155.50 in 1950 pursuant to the modified agreement, computed at $1.50 per television set manufactured. Petitioner received from Philharmonic interest of 3 1/2 per cent per month on the average monthly loan outstanding, aggregating $10,227.86 and $1,144.53 in 1949 and 1950, respectively. In 1949 petitioner also received interest of $1,184.72 from Stephen Properties. Petitioner reported on its 1949 return, interest of $10,227.86 from Philharmonic, other interest of $1,184.72, the total of $1.50 payments from Philharmonic of $14,286, and a gross loss from sales of $492.95. It claimed deductions of $10,141.84. For 1950 petitioner reported interest from Philharmonic of $1,144.53 and a total of $1.50 payments from Philharmonic of $11,155.50. It claimed deductions of $8,751.59. The $14,286 and $11,155.50 received by petitioner from Philharmonic in 1949 and 1950, respectively, do not constitute interest on indebtedness. Opinion Our finding of fact, in effect, disposes of the controversy *223 between the parties, which in the last analysis narrows to a question of interpretation of the agreement which petitioner had with Philharmonic. Respondent contends that Philharmonic's agreement to pay, in addition to specified interest, a certain sum for each television set manufactured by it was in substance a characterization of these additional amounts as interest. He says the amounts so received then became personal holding company income under section 502(a), Internal Revenue Code of 1939, [1] and that the requisite percentage of personal holding company income then results subjecting petitioner to the surtax. We are in accord that the written agreements, and particularly the extension letter of October 22, are ambiguous and require interpretation. The entire transaction, however, and particularly the oral testimony [2] have led us *224 to the conclusion embodied in our findings that these additional payments were not agreed to, nor paid, nor received, nor intended as interest. Rather than the payments being the consequence of the loan, we think the actual transaction was essentially the opposite: that is, that the loan in the first place was a consideration for and a result of the distributorship option which Philharmonic granted to petitioner; and that when the mandatory repayment date was extended to coincide with the expiration of the option, the additional payments were the price for petitioner's agreement to modify the option. The stipulated rate of interest on the loan remained the same as before. [3] But the situation surrounding the option was radically changed. And both the logic of the situation and the oral testimony [4] persuade us that it was this which caused the agreement to pay the additional amounts. *225 Respondent's interpretation of the letter of extension as associating the interest with the additional payments is not the only possible one. The extended mandatory date for the loan repayment and the date for termination of the option were made the same - February 1. If this is regarded as the meaning of the descriptive words fixing the end of the period for the additional payments, that part of the letter would then read, in effect: "$1.50 per unit on each television set manufactured by you between the date hereof and the date on which you are required to repay the loan, namely, February 1," that being also the date at which the option would terminate. [5] Accepting, as we do, that interpretation of the agreement, the additional payments need not be regarded as partaking of the nature of consideration for the use or forbearance of money, Old Colony R. Co. v. Commissioner, 284 U.S. 552; Elverson Corporation, 40 B.T.A. 615, 644, affd. (C.A. 2) 122 Fed. (2d) 295, and are not to be treated as interest. The imposition of the personal holding company surtax is not warranted. *226 Decision will be entered under Rule 50. Footnotes
1. SEC. 502. PERSONAL HOLDING COMPANY INCOME. For the purposes of this subchapter the term "personal holding company income" means the portion of the gross income which consists of: (a) Dividends, interest (other than interest constituting rent as defined in subsection (g)), royalties (other than mineral, oil, or gas royalties), annuities.↩
2. Q. Was there talk about how much this compensation was to be for the time that was being spent by the officers of petitioner? A. It was worked out on the basis of the sets produced until February 1st, when a final determination would be made about the whole thing. Q. And what was the exact amount that was agreed to? * * *
A. $1.50 per unit. Q. Manufactured by Philharmonic? A. That is correct. ↩
3. Q. What was said about interest on the loan? A. To maintain it at the same rate that it was before. Q. And that rate was what? * * *A. Three and a half per cent. Q. Per month? A. Yes. ↩
4. Q. Were these payments, which are mentioned there of $1.50 in this Petitioner's Exhibit 5, to continue indefinitely? A. Until the contract of distributorship was finally consumated [consummated], if it were to be. Q. And was it your - when was it agreed that you would rediscuss the whole matter of the distributorship and how it should be arranged? A. February 1st. Q. So that the question of the distributorship at the time this modification agreement was signed was left open, is that correct? * * *
A. That's correct. * * *↩
5. Now, at the same time, when these conversations concerning the distributorship took place, was there also talk of extending the loan? A. Yes. The loan was extended simply to terminate at the same time so that - Q. At the same time as what? A. As the option on the distributorship. Q. And that was to terminate February 1st? A. That is correct.↩