Albin J. Strandquist and Carol E. Strandquist v. Commissioner.
Strandquist v. Commissioner
Docket No. 3654-66.
United States Tax Court
T.C. Memo 1970-84; 1970 Tax Ct. Memo LEXIS 277; 29 T.C.M. (CCH) 387; T.C.M. (RIA) 70084; April 13, 1970, Filed *277 On the facts, held, (1) that the $125,000 paid by petitioner Albin Strandquist to his former wife Marjorie in 1960, pursuant to the terms of an agreement incident to a divorce, dated March 11, 1960, was solely for the purchase of her one-half interest in the Jan-Ann Breeding Farm; and, hence, petitioners correctly reported their long-term capital gain in the taxable year 1962 from the sale of the farm in March 1962 to the Sisters of Notre Dame De Namur. Held further, that petitioners are entitled to a deduction for depreciation of the assets of the farm during the taxable years 1961 and 1962 in the amounts claimed on their joint Federal income tax return. Held, (2) that petitioners are not entitled to charitable contribution deductions under sec. 170, I.R.C. 1954, for $5,000 in cash and for property with an alleged value of $38,679.47 transferred to the Sisters of Notre Dame De Namur. Held, (3) that petitioners are not entitled to a deduction for the taxable years 1962 for "farm expense" of the Jan-Ann Breeding Farm in the claimed amount of $2,473.84, but only $700 allowed by respondent. Held, (4) that petitioners realized, during the years 1961 and 1962, additional income of $1,200 *278 in each year from the receipt of economic benefit resulting from trading in two used automobiles for two new ones from Strandquist Motors, Inc., of which Albin was the president and a minority stockholder; held further, that petitioner realized longterm capital gain of $1,845 from the sale in 1962 of an automobile used in his business Michael T. McGreevy, Charles A. Thomas, William E. Collins, and Frank P. Maggio 206 Rockford News Tower, Rockford, Ill., for the petitioners. James E. Caldwell, for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: Respondent determined a deficiency in the income tax of petitioners for the taxable years 1961 and 1962 in the amounts of $1,114.45 and $39,110.69, respectively. The issues presented for our consideration are: (1) Whether the petitioners realized longterm capital gain of $274,613.21 on the sale of the Stable Property land in the taxable year 1962, instead of the net gain of $227,164.12 from that sale reported on their joint Federal income tax return for 1962. The component issues are: (a) whether the $125,000 paid by petitioner Albin to his former wife Marjorie in 1960, pursuant to the terms of an agreement incident *279 to a divorce, was solely in settlement of overall property interests, including marital rights, or a sale of her one-half interest in the Jan-Ann Breeding Farm; and (b) whether petitioners are entitled to a deduction for depreciation of the assets of the Jan-Ann Breeding Farm during the taxable years 1961 and 1962 in the claimed amounts of $3,256.30 and $678.38, respectively. (2) Whether the petitioners are entitled to charitable contribution deductions under section 170, I.R.C. 1954(a) for $5,000 cash, and (b) for property transferred to the Sisters of Notre Dame De Namur with an alleged value of $38,679.47. (3) Whether petitioners are entitled to a deduction for the taxable year 1962 for "farm expense" of the Jan-Ann Breeding Farm in the claimed amount of $2,473.84, or in the amount of $700 allowed by respondent; and 388 (4) Whether (a) petitioner realized, during the taxable years 1961 and 1962, additional income of $1,200 in each year from the use of two automobiles from Strandquist Motors, Inc., and (b) whether the petitioners realized and failed to report long-term capital gain of $1,845 received on the sale in 1962 of a business automobile purchased in 1947. Some of the facts *280 have been stipulated and are found accordingly. At the time the petition herein was filed, petitioners Albin J. and Carol E. Strandquist, husband and wife, resided at Rockford, Illinois. They filed joint Federal income tax returns for the taxable years 1961 and 1962 with the district director of internal revenue, Chicago, Illinois. Issue 1. Capital Gain From Sale of Stable Property
(a) $125,000 Payment to Marjorie From July 17, 1919, to February 23, 1960, Albin J. Strandquist, sometimes hereinafter called Albin or petitioner, was married to Marjorie M. Strandquist, sometimes hereinafter referred to as Marjorie. On March 27, 1958, Marjorie filed a complaint for separate maintenance against Albin in the Circuit Court of Winnebago County, Illinois, which was dismissed on June 15, 1959. The Appellate Court, Second District, Illinois, sustained the dismissal. Early in 1960, Albin filed a complaint for divorce against Marjorie in the same court on grounds of desertion. A jury trial was held and the jury found Marjorie guilty of willful desertion. On February 23, 1960, the Circuit Court entered a decree approving the jury verdict, specifically finding that neither party was entitled to *281 alimony. At the time of the filing of the separate maintenance action in 1958 and at the time of the divorce, evidenced by the decree dated February 23, 1960, Albin and Marjorie held, as joint tenants or tenants in common, four parcels of real estate, which were: (a) The family residence located on Oldwood Road, Rockford, Illinois. This property was held by Albin and Marjorie in joint tenancy. There was no mortgaged indebtedness against the property. (b) A summer residence located at Lake Geneva, Wisconsin. This property was held by Albin and Marjorie as tenants in common. There was a mortgage indebtedness against the property of $20,000. (c) A residence located on Kingsway Street, Rockford, Illinois. This property was held by Albin and Marjorie as tenants in common. There was a mortgaged indebtedness against the property of $10,000. (d) Ninety-nine acres of improved land located on Alpine Road in Rockford, Illinois, which was known as the Jan-Ann Breeding Farm or "Stable Property" or "Alpine Road Property." The Jan-Ann Breeding Farm was a partnership organized in 1951 under the laws of the State of Illinois. Between 1951 and 1958, Albin and Marjorie had engaged as equal partners in *282 the business of raising horses on partnership property consisting of approximately 99 acres. In February 1958, they entered into an agreement to liquidate the assets of the partnership and to dissolve it. They agreed to hold the real estate as tenants in common and that neither party would file a petition to partition the partnership real estate prior to February 5, 1960. At the time of his divorce from Marjorie in February 1960, Albin did not own any real estate except the aforementioned interests held in conjunction with Marjorie. In addition to such interests, Marjorie also owned, either alone or with persons other than Albin, two gas station properties in Rockford, Illinois, and a small farm in DeKalb County, Illinois. On February 23, 1960, attorneys representing Marjorie and an attorney representing Albin met and discussed the disposition of the property owned by Albin and Marjorie. Prior to this occasion, that is, early in 1958, attorneys for Albin and Marjorie discussed the distribution of their property in the event they should be divorced and in the course of that discussion, it was agreed on behalf of their respective clients, that if they should obtain a divorce, Marjorie *283 would occupy the Oldwood Road residence in Rockford and Albin would occupy the summer home in Lake Geneva, Wisconsin, on a temporary basis. Discussions were also held in 1958 and 1959 between the attorneys representing the parties regarding the disposition of their jointly-owned real estate. Albin and Marjorie agreed at that time that neither party would bring any action to partition the Stable Property prior to February 5, 1960. Albin suggested to Marjorie in 1958 or 1959 that the Stable Property could be sold and the net proceeds divided equally between the parties in the event they were divorced. 389 Albin testified during Majorie's suit for separate maintenance in 1958 and during his suit for divorce in 1959 that he valued the Stable Property at $250,000, or $2,500 an acre. In the separate maintenance action between the parties, the Appellate Court of Illinois found as a fact that the assets of the Stable Property had a value of $225,000. Prior to their divorce on February 23, 1960, Albin and Marjorie were unable to reach any agreement concerning the disposition of the real estate known as the Jan-Ann Breeding Farm. However, on February 23, 1960, during the recess in the divorce *284 proceeding, there was a discussion between the attorneys for Albin and Marjorie regarding the disposition of the Stable Property. Albin, through his attorney, offered to pay $125,000 for Marjorie's half-interest in the Stable Property, or to sell his half-interest to her for $125,000. Marjorie maintained that her half-interest in the Stable Property was worth $150,000. The following day, February 24, 1960, Marjorie's attorney wrote a letter to Albin's attorney regarding the discussion between them on the previous day: Gentlemen: The more I think about it I am convinced that if at all possible the Strandquists ought to settle their problem between them rather than resort to a public auction sale. Mrs. Strandquist's original proposition was that she would sell her one-half interest in the Alpine property, the horses and equipment for $150,000.00; that he convey his one-half interest in the Oldwood Road home and pay her $15,000.00. We negotiated further yesterday and came up with a proposition of Mr. Strandquist paying $125,000.00 to Mrs. Strandquist and conveying to her the home; so the actual difference between these two propositions is approximately $34,000.00. It seems to me that *285 we ought to be able to compromise this small difference. Maybe, the problem could be solved by Mr. Strandquist paying Mrs. Strandquist $9,000.00 in cash, conveying to her the Oldwood Road home and putting the Alpine property in trust with a trust company, and providing that it shall not be sold without the consent of both parties for a period of x number of years, after which it may be sold at the request of either by the trustee for the highest and best price obtainable in the market. Subsequent to the meeting on February 23, 1960, Marjorie authorized her attorneys to take steps to perfect an appeal of the divorce. After a series of discussions and an exchange of letters, Marjorie's attorney drafted a property settlement agreement providing for the disposition of all jointly-owned properties held by her and Albin. On March 11, 1960, Albin and Marjorie executed an agreement which provided, inter alia, for the disposition of all of their jointlyheld real estate and for the release by Albin of any dower claims to Marjorie's real estate. Under the agreement, Marjorie was to take the Rockford residence and Albin was to take the Lake Geneva summer home, the Kingsway Street property, and *286 the Jan-Ann Breeding Farm. In addition, the agreement provided as follows: 4. The Husband shall pay to the Wife within ten days after the date of this agreement the sum of $125,000.00 in cash and the documents of conveyance and transfer from each to the other shall be held by Pedderson, Menzimer & Conde for the Wife and by Miller, Thomas, Hickey & Collins for the Husband until the payment by the Husband to the Wife of said sum of $125,000.00. 5. It is agreed between the parties hereto that upon the completion of this agreement that each of the parties hereto is forever barred and foreclosed from dower, homestead and from any and all other rights, claims or demands whatsoever against the other and to any and all claims or interest whatsoever in and to the property of the other now owned or hereafter acquired, and this agreement is considered as a complete settlement and liquidation of all of the affairs between the parties hereto including property held jointly or in partnership or otherwise. On March 15, 1960, Albin made out a check in the amount of $125,000 payable to Marjorie. Albin also executed quitclaim deeds to the Rockford residence and to Marjorie's own properties which he *287 exchanged for quitclaim deeds from Marjorie to the Lake Geneva summer home, the Kingsway Street property, and the Stable Property. Marjorie's quitclaim deed to the Stable Property was recorded in the recorder's office of Winnebago County, Illinois, on March 15, 1960, with Federal documentary stamps in the amount of $137.50 affixed and cancelled. In 1960, section 4361 of the 1954 Code imposed a tax of 55 cents on each $500 or fractional part thereof of 390 the net consideration paid for a conveyance of real property. The Federal documentary stamps affixed to Marjorie's quitclaim deed indicated a net consideration received by her in the amount of $125,000. Marjorie refused to accept the quitclaim deed on behalf of Albin without these stamps. After Albin acquired Marjorie's half-interest in the Stable Property, he notified the accounting firm which had kept the books of the Jan-Ann Breeding Farm partnership since 1951 that he had paid Marjorie $125,000 for her interest in the partnership assets and he supplied the accounting firm with new book cost figures for her former interest in such assets, based on his allocation of a total purchase price of $125,000. The cost allocation made by *288 Albin, as of March 16, 1960, to reflect the purchase of Marjorie's half-interest in the partnership assets and the resulting increase in his tax cost or basis in such assets as the sole owner thereof is as follows: *10 JAN-ANN BREEDING FARM COST BASIS
(A)
(B)
(C)
(D)
(E)
Jan-Ann Breeding Farm assets, 3/15/60
Partnership net book cost at 3/15/60
AJS (1/2) net book cost at 3/15/60
Allocated cost, 1/3 interest of MMS at 3/16/60
AJS net book cost at 3/16/60 columns (C)&(D)
1. Land-79 acres
$11,918.24
$ 5,959.12
$73,348.72
$ 79,307.84
2. Land-20 acres 1,610.24
805.12
10,000.00
10,805.12
3. Total land cost 13,528.48
6,764.24
83,348.72
90,112.96
4. House
5,922.01
2,961.01
10,000.00
12,961.01
5. Old barn
7,591.56
3,795.77
5,000.00
8,795.77
6. New barn
19,825.12
9,912.56
9,912.59
1,825.12
7. Garage
596.42
298.21
500.00
798.21
8. Silo
429.75
214.88
500.00
714.88
9. House trailer 173.75
86.87
86.87
173.74
10. Total buildings cost 34,538.60
17,269.30
25,999.46
43,268.73
11. Farm machinery
757.94
378.98
378.96
757.94
12. Farm equipment
117.15
58.57
58.57
117.15
13. Tack
185.05
92.53
92.52
185.05
14. Fences
530.58
265.29
1,000.00
1,265.29
15. Water & sewer system
151.87
75.93
75.94
151.87
16. Furniture & fixtures
1,868.28
934.14
1,250.00
2,184.14
17. Land improvements 1,494.44
747.22
1,750.00
2,497.22
18. Total miscellany cost 5,105.31
2,552.66
4,606.00
7,158.66
19. Cash, receivables, etc.
1,088.56
544.28
544.28 140,540.35
20. Horse
7,739.05
3,869.53
7,569.52
21. Partners' loans
(13,040.00)
(6,520.00)
3,000.00
22. Payroll deductions, etc.
(135.90)
(67.95) (67.95)
$0125,000.00
*289 This schedule was followed in the preparation of Albin's Federal income tax returns in 1960 and subsequent years for purposes of reporting his depreciation deductions, gains, and losses from such assets. There were six buildings on the Stable Property land when Albin acquired Marjorie's half-interest on March 15, 1960. (b) Depreciation of the Assets of the Jan-Ann Breeding Farm As a result of the purchase of Marjorie's half-interest in the Jan-Ann Breeding Farm on March 15, 1960, for $125,000, Albin increased the adjusted tax basis of the depreciable assets of the farm from $38,583.75 to $49,367.46 by allocating a portion of the purchase price to these assets. Petitioners included on their joint Federal income tax returns for the taxable years 1961 and 1962 depreciation deductions on certain assets of the farm in the respective amounts of $3,256.30 and $678.38. Respondent, in his notice of deficiency, determined that the basis at March 15, 1960, of said assets was $38,583.75 instead of $49,367.46 as shown on their returns, and hence he allowed only the respective amounts of $2,428.86 and $505.80. Issue 2. Charitable Contribution Deductions On December 26, 1961, petitioners Albin *290 and Carol E. Strandquist entered into an "Option Agreement" with the Catholic Diocese of Rockford for the purchase and sale of 99 acres of land comprising the Stable Property of the Jan-Ann Breeding Farm. Pursuant to this agreement, Albin was paid $20,000 for a 60-day option to purchase the Stable Property for $346,500. 391 The agreement also provided, inter alia, that the option payment ($20,000) would be applied to the purchase price in the event the Diocese exercised the option; otherwise the consideration paid for the option would belong to Albin in full; and that if the option to purchase the land was exercised, then "the buildings thereon and all the equipment therein shall be retained by the Grantor," all allowed Albin 90 days after delivery of the deed "to cause all buildings on the premises to be removed and all holes left after such removal to be filled to grade level, and remove from the premises all debris caused by the removal or salvaging of such buildings." In January 1962, the Catholic Diocese of Rockford assigned its interest under the aforesaid option agreement to St. Mary's Educational Institute at Cincinnati, an Ohio nonprofit corporation, which exercised the option. *291 St. Mary's Education Institute at Cincinnati is the corporate name of the Sisters of Notre Dame De Namur, a teaching order of Roman Catholic nuns, hereinafter sometimes called Sisters, which planned to build a women's college in Rockford. The following month Albin sent the Sisters a letter, dated February 1, 1962, which read in pertinent part as follows: Dear Sisters: In appreciation of your public charity in your particular field, and in anticipation of the continuance of the same in Rockford, Illinois, I do hereby pledge myself to make to you, during the year 1962, a gift in the sum of Five Thousand Dollars ($5,000.00). This pledge is conditioned upon your purchasing or causing to be purchased from me certain land lying in Section 8, Township 44 N.R. 2 E. of the Third Principal Meridian, in Winnebago County, Illinois. The Sisters exercised their rights under the Option Agreement, dated December 26, 1961, and a warranty deed and other instruments of transfer of title to the land, dated February 24, 1962, were completed on March 15, 1962. This warranty deed conveyed the Stable Property land to the Sisters "[excepting] from such grant all buildings and fixtures situated thereon, the *292 same being reserved unto the grantors." By an instrument designated Bill of Sale of Personal Property, dated February 7, 1962, petitioners in consideration of "One ($1.00)… DOLLAR and other considerations" stated that they "bargain, sell and deliver" the buildings and fixtures thereunto attached to the Sisters. The Sisters did not know that petitioners were going to make a so-called "gift" of the buildings to them prior to the closing with respect to the Stable Property on March 15, 1962. In a letter dated March 30, 1962, the Sisters wrote to Albin with respect to the sale of the Stable Property, stating in part, as follows: One thing only is a matter for regret as well as for delight: The stables, barn and training area. We were amazed - and baffled - by our unexpected acquisition! It is too bad that some one in the area would not be interested in buying, moving, and utilizing them for the people of Rockford and for our college students. For us to operate the stables is unrealistic; yet they would surely delight many a young woman who will come to us. Thereafter the Sisters entered into a contract dated May 1, 1962, with the Ballard Wrecking Company in which the latter agreed to remove *293 the buildings on the Jan-Ann Breeding Farm (except for certain foundations) without charge, and Ballard would take title to all salvage. Subsequently the Ballard Wrecking Company razed these buildings. Albin's pledge to contribute $5,000 during 1962 to the Sisters was acknowledged by them on April 29, 1962; fulfilled by Albin on December 18, 1962; and receipt of the contribution was acknowledged by the Sisters on December 29, 1962. Petitioners reported a long-term capital gain of $227,164.12 from the sale of the Stable Property land to the Sisters on Schedule D of their joint Federal income tax return for the taxable year 1962. Albin's gross sales price was reported as $346,500 and his tax cost or basis for the land and certain land improvements sold was reported as $97,977.73. This basis was computed by adding (1) the portion of $125,000 allocated to the cost of acquiring Marjorie's interest in such land and improvements on March 15, 1960, adjusted to the date of sale at $85,261.27; (2) his tax basis for his original partnership interest in such land and improvements, adjusted to the date of sale at $7,716.46; and (3) plus an additional cost incurred by Albin of $5,000 for a portion *294 of the land sold. [1] 392 Albin's reported expenses of sale on the transactions were $21,358.15. Petitioners also claimed charitable contribution deductions of $38,679.47 and $5,000 on their joint Federal income tax return for 1962 on account of the alleged gifts in 1962 of the Stable Property buildings and $5,000 in cash to the Sisters. The amount deducted as the fair market value of the buildings was their depreciated straight-line cost or basis on Albin's books at March 15, 1962. St. Mary's Educational Institute at Cincinnati, the Sisters, is a religious organization to which charitable contributions were deductible in 1962 under subsections (A) and (B) of section 170 of the Code of 1954. Issue 3. Deduction for Farm Expense ($2,473.84) For the taxable year 1962, petitioners claimed a deduction on their joint Federal income tax return for "farm expense" in the total amount of $2,473.84, which consisted of "labor hired" in the amount of $1,184.60 and "loss on furniture" in the sum *295 of $1,289.24. As to the labor expense in controversy, from 1955 until March 1962, Albin employed a man named Strickland to manage the Stable Property. When Albin disposed of the property, it was necessary to discharge Strickland and Albin gave him one month's salary and miscellaneous farm equipment as "severance pay." Included in the farm equipment was an old tractor, two mowers, a saddle, and some bridles. Albin deducted the depreciated cost of this equipment as shown on his books at March 15, 1962, in the amount of $1,184.60 on Schedule F of his 1962 Federal income tax return as a "labor hired" expense. Respondent, in his notice of deficiency, allowed $700 of the claimed labor expense of $1,184.60. With respect to the loss on furniture in dispute, one of the buildings given to the Sisters by Albin in 1962 was a house partially furnished with wall-to-wall carpeting throughout, an electrical range, a refrigerator, and a washing machine. These furnishings were not removed from the house when it was given to the Sisters. Petitioners deducted the depreciated cost of such furnishings as reflected on Albin's books at March 15, 1962, in the amount of $1,289.24 on Schedule F on their 1962 *296 Federal income tax return as a "loss on furniture." Respondent disallowed in full the claimed amount of $1,289.24. Issue 4. Automobiles During the years 1961 and 1962, petitioner was president of Strandquist Motors, Inc., a franchised distributor of Plymouth automobiles in the Rockford, Illinois, area. He had been its president since it was established. Albin owned 29 shares out of 2,000 shares outstanding in the Company. His son, Jack Strandquist, was vice president, general manager, and the controlling stockholder of Strandquist Motors, Inc., hereinafter sometimes called the Company. Albin was also the president of National Lock Co., Rockford, Illinois. When the Company acquired a new automobile from the factory, the invoice therefor was attached to the back of an inventory record card maintained by the Company for each vehicle in its stock. A white card was used for a new automobile, a pink or buff card for a used car, and all the information was recorded on such cards, including the serial number of the vehicle and its cost price. When an automobile was sold, the purchaser's name was entered on the inventory card in addition to an invoice to the purchaser, and this card was retained *297 by the Company as part of its permanent records. When a new automobile was sold by the Company and a used one taken as a trade-in, a record was also maintained of the results of the disposition of such tradein. From these records it was possible for the Company to ascertain the ultimate profit or loss from a transaction involving a trade-in car. During the fall of each year from 1947 until 1962, Albin traded in two used automobiles he had received new the previous year and obtained two new automobiles from the Company. The transaction was a so-called "even exchange" involving no cash payment by Albin. One of these automobiles was used 75 percent for business purposes during 1961 and 1962. Petitioner, in the fall of 1961, owned a 1961 DeSoto which he traded in to the Company for a 1962 Plymouth automobile. The 1961 DeSoto was a higher-priced model when it was new than the 1962 Plymouth he received in exchange for it. The 1961 DeSoto was sold by the Company for $2,295 and a 1957 automobile as a trade-in; and the 1957 automobile was later sold by the Company for $595. The gross amount ultimately received by the Company for the 1961 DeSoto traded in, which was sold, and 393 the 1957 DeSoto, *298 used as a trade-in, was $2,890. During the taxable years involved, when Albin acquired a new automobile from the Company in an "even exchange," title to the new vehicle was placed in his name. With respect to the automobile which Albin traded in for the new vehicle, he would endorse the title to the used automobile on the back "in blank" as "the seller to the company," and the Company notarized the signature. When this used automobile was later sold by the Company, the name of the purchaser was filled in. The Company did not "trade even" with other individual customers in the normal course of business. The Company almost never received the factory-suggested retail prices on sales of new automobiles to the general public because competition forced the Company to sell for less. The Company sold automobiles at its dealer cost to the Rockford Police Department in every year since 1958 but one when it lost the bid. The Company also regularly sold automobiles to fleet accounts at $50 over its dealer cost and had contracts to do so which did not require that a minimum number of automobiles be purchased. The main reason that the Company sold automobiles at its cost or slightly over its cost *299 to purchasers other than the general public was that the Company had a clause in its franchise contract imposing a Minimum Sales Requirement ("MSR") necessitating sales at cost, or close to cost, in order that the required number of sales could be made. The practice is general in the automobile distribution industry. In the fall of 1961, Albin had acquired two 1962-model automobiles from the Company. In 1962, the Company took his two 1962-model automobiles in a consignment arrangement under which the Company was to sell the cars for petitioner and remit the net proceeds to him after deducting its expenses. Both of Albin's 1962 automobiles were sold in December 1962 by the Company. Trade-ins were taken from the buyers of the automobiles and these trade-ins were not sold by the Company until 1963. The automobile traded in by the purchaser of one of Albin's automobiles involved herein was sold on January 28, 1963, for cash and this was added to the cash received in December 1962 for Albin's 1962 automobile. The net proceeds from the sale of Albin's 1962-model automobiles, representing the gross proceeds less selling and reconditioning expenses of both cars, amounted to $4,940 and were *300 paid by the Company to Albin by check dated February 5, 1963. The Company had taken and sold cars on a consignment basis from time to time for good customers although this is not a regular arrangement in the operation of its business. Petitioners reported their income during the taxable years involved on the cash receipts and disbursement method. Respondent determined that petitioners realized long-term capital gain in the amount of $1,845 from the sale in 1962 of one of the 1962-model automobiles which had been used 75 percent for business purposes. Opinion Issue 1. Capital Gain From Sale of Stable Property
(a) $125,000 Payment to Marjorie Respondent determined that petitioners realized and failed to report on their Federal income tax return for the taxable year 1962, long-term capital gain on the sale of Jan-Ann Breeding Farm in the amount of $47,449.09. On their 1962 return, petitioners reported long-term capital gain from the sale of this farm in the amount of $227,164.12 and respondent contends that they should have reported $274,613.21 (a difference of $47,449.09) because Albin had erroneously allocated $125,000 to the basis of the property. [2] *302 This $125,000 was paid 394 by Albin *301 to his former wife, Marjorie, pursuant to a written agreement subsequent to their divorce in 1961 which effected a division of their jointly-owned properties. It is respondent's position that the petitioner has failed to show that any part of the $125,000 was paid exclusively to acquire her one-half interest in the Jan-Ann Breeding Farm and, therefore, the adjusted basis for determining the gain or loss from the sale of this farm and the allowance for depreciation of the farm assets is the cost thereof. Secs. 1011 and 1012, I.R.C. 1954. [3] *303 The controversy arises in the instant proceeding because petitioners sold the Stable Property in March 1962, 2 years after the divorce, to a religious teaching order for $346,500. The principal issue before us is whether the $125,000 payment made pursuant to the March 11, 1960, settlement agreement, incident to the divorce, was in whole or in part intended by the parties to said agreement as consideration to Marjorie for her one-half interest in the Jan-Ann Breeding Farm, or was a payment made in consideration of the total settlement of their property interests and marital rights. Our analysis of the agreement does not support respondent's contention that the $125,000 was a "package payment" to Marjorie for the overall settlement of the property interests and marital rights of the parties. Succinctly, paragraph 1 of the agreement provides that Marjorie would convey *304 her half-interest in three jointlyowned properties, including the Jan-Ann Breeding Farm, to Albin. Paragraph 2 provides that Albin would convey his half-interest in one jointly-owned property to Marjorie. Paragraph 3 provides that Albin would release, through conveyance, his dower interest in three properties owned by Marjorie. Paragraph 4 provides that Albin would pay Marjorie $125,000 in cash simultaneously with the exchange of the documents of conveyance and transfer from each to the other. Paragraph 5 provides that any claims which either party had against the person or property of the other would thereafter be barred. And paragraph 6 provides that the decree of divorce of the parties would remain in full force and effect with Albin paying Marjorie's legal fees. In essence, under the agreement Marjorie was to become the sole owner of the Rockford residence and Albin the sole owner of the other three jointly-owned properties, i. e., the Lake Geneva summer residence, the Kingsway Street home, and the Jan-Ann Breeding Farm. We find that the agreement lacks clarity and specificity in several material respects. No allocation of the $125,000 payment in paragraph 4 was specified for the *305 release or acquisition of any particular property interest or group of marital rights mentioned therein. Also, the separate values of the properties involved in the division of properties were not set forth in the agreement, nor did the parties indicate why Albin was to pay Marjorie $125,000. It is reasonable to infer that the payment in controversy had something to do with the real estate conveyances set forth in the first two paragraphs which were not to occur until Marjorie received the payment. Although respondent avers that the agreement does not specifically earmark the $125,000 payment to any particular parcel of land jointly owned by Albin and Marjorie, he contends that we are limited to the confines of the written agreement in determining the intention of the parties as to this payment. We do not agree. The parol evidence rule to which respondent refers only excludes evidence varying a written agreement where the issues are between the parties to it, and does not affect the right of the respondent, who was not a party, to go behind the written agreement in order to discover the true facts. Stern v. Commissioner, 137 F. 2d 43, 46 (C.A. 2, 1943), affirming a Memorandum Opinion *306 of this Court. Opinion of this Court. Moreover, we are not limited to a review of a written agreement between the parties thereto where there is an ambiguity in that agreement concerning the nature and purpose of a payment. Smith v. Commissioner, 324 F. 2d 395 725, 726 (C.A. 9, 1963), affirming a Memorandum Opinion of this Court; Thorsness v. United States, 260 F. 2d 341, 344-345 (C.A. 7, 1958), and cases cited therein; Walter Lacy, 39 T.C. 1100, 1104 (1963), affd. 341 F. 2d 54 (C.A. 10, 1965); and Haverty Realty & Investment Co., 3 T.C. 161, 167 (1944). In our judgment, paragraph 4 of the agreement of March 11, 1960, is sufficiently ambiguous to permit extrinsic evidence to explain just what the parties intended and what the $125,000 was paid for. After careful consideration of the entire record, including the negotiations between the respective attorneys for Albin and Marjorie leading up to the execution of the final agreement of March 11, 1960, we are convinced that the parties intended that paragraph 4 of the agreement refer exclusively to the purchase and sale of Marjorie's interest in the Jan-Ann Breeding Farm to petitioner. We are persuaded that when the parties executed the *307 agreement on March 11, 1960, there was little or no controversy between Albin and Marjorie concerning the Lake Geneva property, the Kingsway property, and the Oldwood Road property because their values and the fact that Marjorie was to take title to the residence in her own name had been agreed upon earlier in the separate maintenance suit. Apparently, the only property that the parties were not able to agree on at the time of the divorce proceeding was the Stable Property. We find no reason to doubt Albin's unequivocal testimony that he intended to pay, and did pay, $125,000 for Marjorie's half-interest in the Stable Property. His testimony in this regard was corroborated by his attorney during the negotiations who testified that during the recess in the divorce proceedings on February 23, 1960, there was a discussion during which Albin, through his attorney, offered to pay $125,000 to Marjorie for her half-interest in the Stable Property or to sell Albin's half to her for that amount. Marjorie maintained that her half-interest in the Stable Property was worth $150,000. All negotiations thereafter related to the Stable Property alone and the final price agreed upon was $125,000. We *308 have found Albin's testimony and that of his two witnesses concerning the payment in question forthright and persuasive. In our evaluation of their testimony, we are of course, mindful that the testimony of Marjorie's attorney conflicts directly with theirs. The testimony of Marjorie concerning the intention of the parties and the character of the $125,000 payment was evasive and unconvincing. Apart from the testimony of petitioner and his witnesses, it is significant that Federal documentary stamps in the amount of $137.50 were affixed and cancelled on the quitclaim deed to the Stable Property, indicating a net consideration of $125,000 received by Marjorie and that these stamps were affixed by Marjorie's attorney or someone in his office. Although there is some dispute as to who actually placed these stamps on the deed, we believe the testimony of Albin's attorney that he "would not accept the deed until they [Marjorie or her attorneys] attached Federal stamps" and that they complied with this condition. As to respondent's argument that Albin's payment of $125,000 was in settlement of Marjorie's marital rights against him, we do not think such rights were of any substantial worth *309 as a claim against petitioner on March 11, 1960. On February 23, 1960, the Circuit Court of Winnebago County entered a divorce decree based upon a jury verdict that Marjorie had willfully deserted Albin, dissolving their marriage, and further ordering that neither party should receive alimony from the other. In our view, the legal effect of this decree was for all intents and purposes to terminate Majorie's claims against petitioner arising out of their marital relationship. Respondent, in support of his position, cites Illinois National Bank v. United States 273 F. 2d 231, 233 (C.A. 7, 1959), certiorari denied 363 U.S. 803 (1962). We find the case to be factually distinguishable from the case before us. In view of the foregoing, and the record as a whole, we hold that petitioners have met their statutory burden of proving that the $125,000 payment was exclusively for Marjorie's half-interest in the Stable Property. Accordingly, petitioner is entitled to an upward revision of his basis in the property involved. (b) Depreciation of the Assets of the Jan-Ann Breeding Farm Respondent contends that petitioners are not entitled to a deduction for depreciation of assets in excess of the *310 amounts allowed by him (i.e., $2,428.86 and $505.80 for the 396 respective taxable years 1961 and 1962) because they have not proven the correct basis of the farm assets in the determination of allowable depreciation. In view of our conclusion as to the $125,000 payment hereinabove, we find that Albin's allocation in 1960 of a portion of that payment to the assets of the farm was reasonable and proper. Under the circumstances, petitioners are entitled to a deduction for depreciation of such assets in the amounts claimed for the taxable years 1961 and 1962. Issue 2. Charitable Contribution Deductions The issue is whether the $5,000 paid by petitioner and the buildings valued at $38,679.47 transferred by him in 1962 to a recognized charitable organization, the Sisters of Notre Dame De Namur, constitute a "charitable contribution" within the purview of section 170 of the 1954 Code. [4] *312 For the taxable year 1962, the petitioners deducted from their gross income the amount of $43,679.47, representing a contribution of $5,000 in cash and property valued at $38,679.47 to the Sisters. In the notice of deficiency, respondent disallowed the claimed charitable deduction in its entirety, determining *311 that petitioners had not established entitlement to the deduction under section 170, supra. Respondent treated the alleged gift of $5,000 as a reduction of the selling price of the Stable Property, thus reducing the price from $346,500 to $341,500. Also, respondent made adjustments in the long-term capital gain reported by petitioners on the sale of the Stable Property land, increasing petitioners' cost for what was sold to the Sisters by $30,549.81 to account for the buildings transferred to them. We shall consider each of the disputed items separately. (a) $5,000 cash The evidence shows and we have found as facts that on December 26, 1961, petitioners and the Catholic Diocese of Rockford entered into an Option Agreement whereby the latter paid petitioners $20,000 for a 60-day option to purchase the 99 acres of land comprising the Stable Property for $346,500, with credit for the $20,000 toward the purchase price. The Diocese assigned its rights in the option to the Sisters, who planned to build a women's college on the site of the property. By letter dated February 1, 1962, Albin proposed to make a gift to the Sisters in the amount of $5,000 cash, stating that, "[this] pledge is conditional upon your purchasing or causing to be purchased from me certain land," referring to the Stable Property. Shortly after receiving the pledge, the Sisters on March 15, 1962, exercised the option and purchased the 99 acres for $346,500. About 8 months later, in December 1962, Albin fulfilled his pledge by sending the Sisters the sum of $5,000. Subject to the limitations of section 170 (b) of the 1954 Code, a deduction is allowed to *313 individuals for charitable contributions or gifts, the payments of which are made within the taxable year to qualified recipients. Sec. 170(c). Since there is no dispute that the Sisters' order is a qualified religious and educational organization, we must decide whether the petitioner's payment constituted a "charitable contribution or gift" within the contemplation of section 170, supra. Referring to section 170 in Harold DeJong, 36 T.C. 896 (1961), affd. 309 F. 2d 373 (C.A. 9, 1962), we stated (p. 899): As used in this section the term "charitable contribution" is synonymous with the word "gift" * * * A gift is generally defined as a voluntary transfer of property by the owner to another without consideration therefor. If a payment proceeds primarily from the incentive of anticipated benefit to the payor beyond the satisfaction which flows from the performance of a generous act, it is not a gift. * * * To the same effect, see C. B. Wilcox, 27 B.T.A. 580, 583, 584 (1933). Numerous cases have delineated subjective distinctions as to the nature of a "gift. " It has been held that the voluntariness of a payment does not automatically render 397 it a gift or contribution. Commissioner v. Duberstein, 363 U.S. 278 (1960); *314 that a gift must proceed from a "detached and disinterested generosity," Commissioner v. LoBue, 351 U.S. 243, 246 (1956), and "out of affection, respect, admiration, charity or like impulses," Robertson v. United States, 343 U.S. 711, 714 (1952). The Courts have held, on the one hand, that the controlling factor is "motive," that is, what was the "basic reason" for the conduct or the "dominant reason" that explains the action in making the transfer, Commissioner v. Duberstein, supra, and, on the other hand, that consideration is the primary concern and that we should avoid confusing motive with legal consideration or expectation of benefits of an economic nature with legal rights. Wardwell's Estate v. Commissioner, 301 F. 2d 632, 636 (C.A. 8, 1962), reversing 35 T.C. 443 (1961). It would serve no useful purpose to analyze the host of cases dealing with the nature of charitable contributions or gifts under the Internal Revenue law and particularly those cases involving "subjective and occasionally ephemeral concepts." Jordan Perlmutter, 45 T.C. 311, 317 (1965). For purposes of the instant case, we deem it necessary to emphasize that it is essential to charitable contributions or a *315 gift inter vivos that they be given absolutely without conditions and irrevocably delivered to the donee. See Linwood A. Gagne, 16 T.C. 498, 502 (1951). In law, there is no presumption of a gift. Simpson v. United States, 261 F. 2d 497 (C.A. 7, 1958). If the payment proceeds primarily from "the incentive of anticipated benefit" to the payor of an economic nature, it is not a gift. Bogardus v. Commissioner, 302 U.S. 34, 41 (1937). In this connection, see Noel v. Parrott, 15 F. 2d 669 (C.A. 4, 1926) where the Court said (p. 671): Although it is held that the motive accompanying a gift is not material, gifts usually proceed from the generosity of the giver; and, where there is any doubt as to the nature of the transaction, the absence of such motive is a pertinent circumstance for consideration. It is an essential characteristic of a gift, however, that it be a transfer without consideration. If there is a consideration for the transaction, it is not a gift. * * * In applying these principles to the facts of record, we are cognizant, of course, that tax provisions as to charities are derived from motives of public policy and are not to be narrowly construed. Helvering v. Bliss, 293 U.S. 144 (1934). *316 Congress made provision for the deduction of charitable gifts in order to induce and encourage the making of such gifts. See S. Rept. No. 1567, 75th Cong., 3d Sess. (1938), 1939-1 C.B. (Part 2) 779, 789. In the instant case the payment of the $5,000 was not prompted by generosity but it affirmatively appears in the record that it was "conditional" upon the Sisters purchasing the Stable Property which would result in a substantial profit to petitioner. Unquestionably Albin's letter dated February 1, 1962, addressed to the Sisters, set forth in extenso in our Findings, was not a true charitable pledge or gift of property absolute and without conditions within the intendment of section 170, supra. The pledge was wholly conditioned upon the purchase by the Sisters of the Jan-Ann Breeding Farm and the ultimate payment of the $5,000 in question several months later by Albin was made with complete assurance of substantial financial return to him. Although the payment to the Sisters may have been prompted by a complex of motives, petitioner has not adduced any cogent evidence of purpose or intent contrary to the stated reason for the pledge as expressed in his letter of February 1, 1962. *317 In no sense of the term was the pledge or gift a voluntary transfer of property by one to another without consideration or expectation of economic gain. We find no merit in petitioner's argument that he was simply trying to protect his charitable interest in the Sisters' promise to build a college in Rockford, rather than to induce them to avoid a forfeiture and to exercise the option agreement when he attached the condition to his pledge. The fact that the Sisters in their correspondence with Albin referred to the $5,000 as a "gift" is not determinative of the issue. Viewing the steps in the overall commercial transaction relating to the sale of the Jan-Ann Breeding Farm, we are convinced that petitioner's dominant reason in making the payment in question was to induce the Sisters to exercise their option to purchase the property which would result in economic benefit to himself. In the light of the foregoing, we hold that petitioner's disbursement of $5,000 to the Sisters in 1962 is not deductible as a gift in computing his income tax for that year. 398 (b) $38,679.47 in property The critical issue here is whether the conveyance of the buildings by petitioner to the Sisters on *318 February 24, 1962, was, in fact, a charitable contribution or gift within the ambit of section 170, supra, as petitioners contend, or an integral part of an overall commercial transaction, as determined by respondent. Respondent's determination is, of course, presumptively correct and it is incumbent upon the petitioners by a preponderance of evidence to establish error therein. For reasons hereinafter stated, we do not believe that this burden has been sustained. The salient facts of record show that Albin retained his ownership of the buildings and equipment located on the Jan-Ann Breeding Farm both in the Option Agreement, dated December 26, 1961, and in the warranty deed of February 24, 1962. Under paragraph 8 of the Option Agreement, Albin assumed the obligation to remove all of these buildings within 90 days after delivery of the deed, to fill to grade level all holes left by these buildings, and to remove all debris caused by the removal. However, about 3 weeks before the 99 acres of land comprising the Stable Property was conveyed to the Sisters, petitioners transferred these buildings to the Sisters by an instrument designated Bill of Sale of Personal Property dated February *319 7, 1962, [5] which recites that in consideration of "One ($1.00) - Dollar and other considerations" petitioners "bargain, sell and deliver" to the Sisters all of the buildings and fixtures situated on the Stable Property. Apparently the Sisters were unaware of the transfer of the buildings to them until the land itself was sold to them for they wrote a letter to Albin dated March 30, 1962, in which, referring to the alleged gifts of the buildings, they said that they were "amazed - and baffled" by their "unexpected acquisition." It is significant that Albin testified he knew the buildings in question had "no value" to the Sisters. [6] Considering his contractual obligation to remove the six buildings and all the equipment therein from the Stable Property, we think it is reasonable to infer that he would have asked the Sisters if they wanted the buildings as a gift or otherwise; and if they would release him of his legal responsibility. Since the Sisters had no use for *320 the buildings, and Albin knew this, their intention to build on the site would have been frustrated by the existence of the structures. Admittedly, a gift must not necessarily represent value or usefulness to the recipient; and the use to which the donee makes of a gift is not determinative of its value. See Daniel S. McGuire 44 T.C. 801 (1965). However, the crux of the issue here is not one of fair market value but of donative intent of the petitioner and the validity of the alleged gift within the meaning of section 170, supra. Where, as here, the conveyance of the buildings is so closely related to a commercial transaction, we must examine the actions of both parties to ascertain whether this is one of "those contributions which are made with no expectation of a financial return *321 commensurate with the amount of the gift." See H. Rept. No. 1337, 83rd Cong., 2d Sess., (1954), A44, quoted in Sarah Marquis, 49 T.C. 693, 700 (1968). In our view there are several material factors which cast considerable doubt on petitioner's alleged benevolent intent with respect to the buildings. Under the Option Agreement, the Sisters obtained a right to require petitioner to remove the buildings by June 14, 1962 (90 days after March 15, 1962). It is clear, therefore, that the Sisters were not obliged to take the buildings nor to assume petitioner's duty of removing them. Also, the Sisters did not want nor could they use the buildings for their projected school. Because of this alleged gift, the Sisters found it necessary to assume petitioner's contractual obligation to remove the buildings. Furthermore, they received their land in poorer condition than they would have received it under the original agreement because the wrecking company leveled only the barn to grade and as to the other buildings, the foundation walls were not removed as would be required under the original option. Petitioner has not adduced an iota of evidence to explain why the Sisters would be willing to 399 *322 release him of his legal responsibility under the agreement and accept the buildings as a gift which had no value to them. Nor is there any evidence before us that a house on the Stable Property was in fact retained by the Sisters as petitioner avers on brief. In the state of the record, we are of the opinion that Albin was involved in a commercial transaction with the Sisters who wanted to buy only his land and that the removal of the buildings thereon was considered as part of the total purchase price for the Stable Property. The fact that Ballard Wrecking Co. razed the buildings for the Sisters without any cost to them does not alter our conclusion. The transfer of the buildings to the Sisters, separate from the conveyance of the 99 acres of land, was a mere contrivance which was put in the form of a charitable contribution or gift in order to conceal its real character. The whole undertaking, although conducted in several steps by petitioner, was in fact an elaborate form of conveyance masquerading as a gift. See Gregory v. Helvering, 293 U.S. 465 (1935). In view of the foregoing, we believe that the alleged gift of the buildings was in fact an integral part of the sale of the *323 99 acres of land and not a gift within the intendment of section 170, supra. Accordingly, respondent is sustained on this issue. Issue 3. Deduction for Farm Expense ($2,473.84) For the taxable year 1962, petitioners claimed a deduction for "farm expense" of $2,473.84 which consisted of "labor hired" in the amount of $1,184.60 and "loss on furniture" in the sum of $1,289.24. In his notice of deficiency, respondent disallowed in full that portion of the claimed amount of $1,289.24 for loss of furniture and allowed $700 of the claimed labor expense of $1,184.60. Each of these disputed items shall be treated separately. (a) Labor hired Petitioners contend that they are entitled to the additional amount of $484.60 for "labor hired," which respondent disallowed for 1962. It is petitioners' position that this amount was "severance pay" and constituted an ordinary and necessary expense under section 162 of the 1954 Code. Briefly, the record shows that petitioners employed a farm hand, Strickland, on the Jan-Ann Breeding Farm and his services were terminated upon its sale to the Sisters on March 15, 1962. In addition to cash paid to Strickland as severance pay, the petitioners transferred *324 to him certain farm machinery and deducted both the cash payment and the depreciated book value of the machinery, the latter in the amount of $484.60. We are satisfied that petitioners transferred to Strickland in recognition of his past services to them the farm machinery in question and that its value represented compensation within the purview of section 162(a), supra. However, the record does not disclose the value of this farm machinery, but we feel justified under the rule of Cohan v. Commissioner, 39 F. 2d 540 (C.A. 2, 1930), in making an estimate which will necessarily bear against petitioner under the circumstances. We therefore find that the value of the farm machinery transferred to Strickland by way of severance pay is $200 and that this amount is deductible in addition to the labor expense allowed by respondent for the taxable year 1962. (b) Loss on furniture Petitioners contend that the depreciated book value of furnishings left in the house given to the Sisters in 1962 in the amount of $1,289.24 is deductible as an abandonment loss in the taxable year 1962 under section 165[7] of the 1954 Code, or in the alternative, as a gift under section 170, supra. Respondent disallowed *325 in full the claimed amount of $1,289.24. The only evidence presented on this issue was Albin's testimony that the deduction in question was based upon a transfer of personal property which was left in the main house on the Jan-Ann Breeding Farm at the time of the conveyance of the six buildings to the Sisters in March 1962. Apart from his vague and general testimony in this respect, Albin introduced no affirmative evidence as to the underlying facts and circumstances which prompted his leaving the personal property in the building. We do not believe that petitioner sustained an ordinary abandonment loss under 400 section 165, supra, for the furnishings left in the house. Petitioner had the legal right and obligation under the terms of his Option Agreement to remove these furnishings from the property and, as noted in our discussion of the *326 alleged gift of the buildings to the Sisters, there is no evidence before us that they released him of this explicit contractual duty. In our judgment petitioner has not met his burden of demonstrating that the transfer of the furnishings occurred independently of the sale of the land. It is noteworthy that petitioner, who has the burden of proof, did not present the testimony of any representative of the Sisters, who undoubtedly could have supplied us with material evidence as to the sale of the land, including the nature of the disposition of the buildings and furnishing therein. Petitioner's failure to introduce such testimony, in our opinion, gives rise to the presumption that if produced it would have been unfavorable. Wichita Terminal Elevator Co., 6 T.C. 1158, 1165 (1946), affd. 162 F. 2d 513 (C.A. 10, 1947). Moreover, to the extent, if any, that legal abandonment of property is considered relevant to tax abandonment under section 165, supra, it has been stated in Goltra v. United States, 96 F. Supp. 618, 625 (Ct. Cls. 1951) that: it is clear that there was in this case no abandonment in the strict legal sense. The legal concept of abandonment is not met without a showing *327 that the article was given up with the idea that it should return to the public domain, or with no idea at all except that the owner was dispossessing himself of it. There can be no abandonment of property to another. Abandonment must be made by the owner, without being pressed by any duty, necessity, or utility to himself, but simply because he no longer desires to possess the thing; and, further, it must be made without any desire that any other person shall acquire the same; for if it were made for a consideration it would be a sale or barter, and if without consideration, but with intention that some other person should become possessor, it would be a gift. * * * In the alternative, petitioners urge that since certain furnishings in question were left in the buildings which they contend were given to the Sisters, they are entitled to the deduction under section 170, supra. We disagree. Our conclusion as to Albin's lack of donative intent with respect to the transfer of the buildings as a charitable contribution or gift within the meaning of section 170 is equally applicable to the furnishings and contents of the buildings. Hence petitioners are not entitled under section 170 to *328 a charitable deduction for furnishings and contents left in the buildings. Issue 4. Automobiles Respondent determined that during each of the taxable years 1961 and 1962 petitioners realized additional income in the amount of $1,200 from the "use" of two automobiles. However, on brief, respondent, relying on section 61(a) of the 1954 Code and sections 1.61-1 and 1.446-1(a)(3), Income Tax Regs., [8] *329 contends that this deficiency is predicated on petitioners having received economic benefit from the receipt of two new automobiles from Strandquist Motors, Inc., in exchange for two used cars without any cash payment for the differential in value. Respondent also determined that petitioners realized long-term capital gain in 1962 in the amount of $1,845 from the sale of an automobile used in their business. The general rule is that the purchase of property for less than its value does not of itself give rise to the realization of taxable income. Such realization normally arises and is taxed upon sale or other disposition. Palmer v. Commissioner, 302 U.S. 63 (1937); Elverson Corporation, 40 B.T.A. 615, 632 (1939), affd. 122 F. 2d 295 (C.A. 2, 1941). Except where stockholders, employees or company officials are involved, the fact that the property may be acquired at a bargain purchase, i.e., 401 below its fair market value, does not ordinarily require a departure from this fundamental principle. William J. Haag, 40 T.C. 488 (1963), affd. 334 F. 2d 351 (C.A. 8, 1964). In Commissioner v. LoBue, supra, at 248, *330 the Supreme Court, in holding that a stock option arrangement, although in the form of a purchase, was actually compensation, stated: It is true that our taxing system has ordinarily treated an arm's length purchase of property even at a bargain price as giving rise to no taxable gain in the year of purchase. See Palmer v. Commissioner, 302 U.S. 63, 69. But that is not to say that when a transfer which is in reality compensation is given in the form of a purchase the Government cannot tax the gain under § 22(a). The transaction here was unlike a mere purchase. It was not an arm's length transaction between strangers. Instead it was an arrangement by which an employer transferred valuable property to his employees in recognition of their services. We hold that LoBue realized taxable gain when he purchased the stock. The law governing the outcome of the issue herein was summarized by this Court in William H. Husted, 47 T.C. 664, 673-674 (1967), as follows: Ordinarily, a purchase of property does not result in the realization of income. This principle was applied by the Supreme Court in Palmer v. Commissioner, 302 U.S. 63 (1937), in which the Court found that the taxpayer was merely a *331 purchaser and, accordingly, his purchase did not result in the receipt of income. Later, however, in Commissioner v. Smith, 324 U.S. 177 (1945), the Supreme Court made it clear that when stock is sold at a bargain for the purpose of compensating someone, such a purchase does constitute the receipt of income. Still later in Commissioner v. LoBue, 351 U.S. 243 (1956), the Court held that a bargain sale of stock to an employee because he is an employee is a compensatory sale. The result of these decisions is to leave us with a question of ascertaining whether * * * was merely a fortunate * * * purchaser of stock or whether he was allowed to purchase it at a bargain for the purpose of compensating him. Applying the principles announced by the authorities cited above, and looking to the substance rather than the form of the transaction in this case, we believe that petitioner realized taxable income in the nature of compensation to the extent of the differential in value between the used cars traded in and the new ones in each of the years involved. In the instant case, there was a significant officer-stockholder relationship to Albin's corporation from which we can reasonably infer the *332 $1,200 differential in question was compensatory. There is no evidence in the record as to the extent of the profits and losses of the Company and the differential could have been in the nature of dividends, though this theory is not urged by respondent. Petitioner's testimony with respect to this issue, and particularly as to his status in the Company during the taxable period involved, was meager and not convincing. His son testified that the Company made no profit on the exchange itself each year, except perhaps $50 above cost because the trade-in of automobiles for his father was similar to sales to fleet accounts, or sales made to the local police department. There is no evidence, however, that such sales were ever made to other individual customers of the Company in an "even exchange," or even $50 above cost, who were not directly related to the Company. The transaction here was not a mere purchase. It was not an arm's length transaction between strangers. Rather it was an arrangement by which the managing officer of a corporation transferred valuable property to another officer in recognition of his past or present services, Commissioner v. LoBue, supra.Unquestionably Albin *333 received more value than paid for. This opportunity was afforded him because he had an executive position with Strandquist Motors, Inc., as well as being a stockholder of this close family corporation. Although petitioner and his son made the bald statement that Albin performed no duties, received no salary, and had no office at the Company, we are of the opinion that petitioner was given preferential treatment in trading in his used cars each year, primarily because of economic considerations, such as recompense for past services going back to 1944 when he founded the Company, and present advisory functions. Aside from the son's general testimony that his father was "honorary president" of the Company, there is no affirmative evidence to support this assertion, and we are not persuaded that such was the case. No evidence was introduced by petitioner that it was the practice of the Company, except in this case, to accept a trade-in of a used vehicle for a new one from individual customers who were unrelated to the Company without payment of the cash 402 differential in value. Indeed, petitioner, on brief, avers that it is obvious that a dealer would "offend loyal customers and set *334 an awkward precedent if he occasionally sold a car in his normal market at his cost simply to clear his inventory." The fact that the Company was able to sell the used cars traded in by Albin at a later time for a profit does not alter our conclusion. Under the circumstances, we believe that section 61, supra, is broad enough to include in taxable income the economic or financial benefit conferred on petitioner as compensation, regardless of the form or mode by which it was effected. Albin received a substantial economic and financial benefit from the Company prompted by its desire to compensate him for his past services if not his current and future executive activities. This is "compensation for services" within the meaning of section 61, supra. For lack of believable evidence to the contrary, we hold that respondent must prevail on this issue. With respect to the sale of a 1962 model automobile by the Company in 1962 on behalf of petitioner, we must uphold respondent in his determination that petitioners realized long-term capital gain of $1,845 in their taxable year 1962. We are satisfied from the evidence and have found as facts that the automobile in question was turned over *335 to the Company in 1962 on a consignment basis [9] and that this automobile was sold in December 1962 for cash and a used automobile. Also, we have found that the used car traded in by the purchaser of Albin's car was sold on January 28, 1963, for cash and that this cash was added by the Company to that received in 1962. The expenses of reconditioning and selling both cars were deducted, and the Company paid the net proceeds of $4,940 on February 5, 1963, by check to Albin. Respondent *336 determined the selling price of the 1962 automobiles involved herein by dividing the net proceeds of $4,940 evenly between the two automobiles, arriving at a selling price of $2,470. He determined an original cost basis (from 1947) of $2,500 for the automobile in question which was used 75 percent in petitioner's business. Respondent then deducted depreciation allowed or allowable of $1,875 from the cost of the automobile ($2,500), and deducted the resultant $625 from the selling price, thus obtaining a long-term capital gain of $1,845 in the taxable year 1962. Petitioner has failed to adduce any evidence to show error in respondent's determination. We are persuaded that the completed sales transaction, insofar as we are here concerned, occurred in the taxable year 1962 when the Company sold Albin's 1962 automobile for cash and a used trade-in. The total sales price received by Albin is measured by the amount of cash received for his 1962 automobile plus the fair market value of the car traded in by the purchaser thereof. Since this car was sold by the Company several weeks later in January 1963, and sales reasonably proximate to the valuation date are recognized as the best evidence *337 of fair market value, we may conclude that the consideration received for the trade-in car in January 1963 is equal to the fair market value which Albin received in 1962 in addition to the actual cash proceeds for his 1962 automobile. In essence, respondent's determination reflects the same principle in computing the sales price received by petitioner. Petitioner, who was a cash basis taxpayer, failed to establish that he did not realize taxable income to the extent of the net proceeds of the sale of his automobile in the taxable year 1962. Constructively received income is taxable when the amount is ascertainable and available to the taxpayer without restriction or is subject to his control. Jaeger Motor Car Company v. Commissioner, 284 F. 2d 127 (C.A. 7, 1960), affirming a Memorandum Opinion of this Court Here, Albin was president of the Company and apparently there was no obstacle to his obtaining the cash proceeds and the used car traded in by the purchaser in 1962 from the Company. Under the circumstances, we hold that petitioners realized long-term capital gain of $1,845 in their taxable year of 1962. Decision will be entered under Rule 50. 403 Footnotes
1. Respondent conceded at the trial that Albin paid $5,000 in 1953 toward the cost of the Stable Property land, which payment was properly included in his tax cost or basis for the land upon its sale in 1962.↩
2. Petitioners' computation of a long-term capital gain on the sale of the Stable Property is not set forth in detail on their 1962 income tax return. Petitioners' counsel at the trial stated that in reporting long-term capital gain on the sale of the land on petitioners' 1962 return, they reported the book cost of Albin's half-interest as a partner in the land in the amount of $11,764, and the bok cost that he had allocated to his acquisition of Marjorie's half-interest in the land in the amount of $83,348, which was out of the $125,000 which he had paid to her. Albin allocated this total of $95,112 to book cost as his tax basis for the land and to this total he added a book cost to him of land improvements, fences, and other improvements, which added up to $97,977.73, the total "cost or other basis" reported by Albin on his return. Respondent, in his notice of deficiency, determined that Albin's cost for Marjorie's half-interest in the land was only $6,764, not $83,348. Respondent has made other reallocations of the cost allocations made by Albin to the half-interest of Marjorie in the assets of Jan-Ann Breeding Farm. Thus, respondent reduced Albin's allocation of $25,999 as the cost of acquiring Marjorie's half interest in the buildings on the Stable Property to $17,269, representing the book value of Marjorie's interest in the buildings immediately prior to Albin's acquisition. 3. SEC. 1011. ADJUSTED BASIS FOR DETERMINING GAIN OR LOSS. The adjusted basis for determining the gain or loss from the sale or other disposition of property, whenever acquired, shall be the basis (determined under section 1012 or other applicable sections of this subchapter and subchapters C (relating to corporate distributions and adjustments), K (relating to partners and partnerships), and P (relating to capital gains and losses)), adjusted as provided in section 1016. SEC. 1012. BASIS OF PROPERTY - COST. The basis of property shall be the cost of such property, except as otherwise provided in this subchapter and subchapters C (relating to corporate distributions and adjustments), K (relating to partners and partnerships), and P (relating to capital gains and losses). * * *↩
4. SEC. 170. CHARITABLE, ETC., CONTRIBUTIONS AND GIFTS. (a) Allowance of Deduction. - (1) General rule. - There shall be allowed as a deduction any charitable contribution (as defined in subsection (c)) payment of which is made within the taxable year. A charitable contribution shall be allowable as a deduction only if verified under regulations prescribed by the Secretary or his delegate. * * * (b) Limitations. - (1) Individuals. - In the case of an individual the deduction provided in subsection (a) shall be limited as provided in subparagraphs (A), (B), (C), and (D). (A) Special rule. - Any charitable contribution to - (i) a church or a convention or association of churches, (ii) an educational organization referred to in section 503(b)(2)↩, * * *
5. Petitioner testified that the alleged gift in question was actually made on March 12, 1962, when the transaction relating to the 99 acres of land was closed, at which time he also gave the Sisters title to the buildings.↩
6. When Albin was asked on cross-examination why he, as a grantor, reserved the right to remove the buildings in the agreement, he replied: A - the Catholic Diocese of Rockford were the proposed purchaser, and I assumed that they were going to build a church and a school on the property, and therefore they would have - they would pay me nothing for the buildings, because they would be of no value to them.↩
7. SEC. 165. LOSSES. (a) General Rule. - There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. * * * (c) Limitation on Losses of Individuals. - In the case of an individual, the deduction under subsection (a) shall be limited to - (1) losses incurred in a trade or business;↩
8. SEC. 61. GROSS INCOME DEFINED. (a) General Definition. - Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items: (1) Compensation for services, including fees, commissions, and similar items; Income Tax Regs. Sec. 1.61-1. Gross income. (a) General definition. Gross income means all income from whatever source derived, unless excluded by law. Gross income includes income realized in any form, whether in money, property, or services. Income may be realized, therefore, in the form of services, meals, accommodations, stock, or other property, as well as in cash * * * Sec. 1.446-1(a)(3)↩. Items of gross income and expenditures which are elements in the computation of taxable income need not be in the form of cash. It is sufficient that such items can be valued in terms of money. * * *
9. In view of the testimony of petitioner, which was corroborated by his son, we find that this transaction was not a sale back to the Company, regardless of the terminology used in the stipulated facts, but rather a consignment to the Company whereby the latter was to act as selling agent of the petitioner to a third party. In using the phrase "sold back" the stipulation was obviously referring to the consignment of the two automobiles to the Company. This Court is not bound as to the law of the case by any concession or stipulation of the parties inconsistent with the underlying facts. Elaine Yagoda, 39 T.C. 170, 183 (1962), affd. 331 F. 2d 485 (C.A. 2, 1964), certiorari denied 379 U.S. 842 (1964) J. W. Gaddy 38 T.C. 943, 951↩ (1962).